# EX PARTE GUILLERMO PEREZ.

San Juan, No. 977.

HABEAS CORPUS BY ALIEN ORDERED TO BE DEPORTED.

Immigration Laws.

    1. The immigration laws of the United States begin with the act of March 3, 1875, but have been changed from time to time until the subject is now governed by the act of February 20, 1907, as itself amended by the act of March 4, 1913.

Immigration Laws — Policy.

    2. The policy of these laws is to protect the American laborer from competition of foreign workmen seeking lower wages.

Immigration Laws — Contract Laborers.

    3. The original basis of the law was to exclude those brought by contract to perform labor for others, but proof of such a contract is not now required.

Immigration Law — Proceedings.

    4. Deportation proceedings under the immigration law are not governed by the ordinary rules of practice and evidence; and everything is reduced to a record, which is sent up to the Secretary of Labor.

Immigration Law — Practice.

    5. When an affidavit by the alien, prior to the examination before an immigration commissioner, is sent to the commissioner, it becomes a part of the record, and may be considered.

Immigration Law — Evidence.

    6. The fact that there was correspondence by which the alien was induced to come to this country is material, although it does not amount to a contract.

Immigration Law — Ignorance as to employer.

    7. The fact that the alien came without knowing the name of an employer is not material, when he came to the United States to perform labor in response to an offer too broad to amount to a contract.

Ex parte Perez.

Immigration Law — Invitation.

8. If an alien comes to this country because a friend writes back in praise of the country, this would violate no law.

Immigration Law — Passage Money.

9. Where the alien's passage is paid for with the money of another, the burden is on the alien to show that he does not belong to one of the excluded classes.

Immigration Law — Inspection.

10. If an alien secured admission by means of false statements, he enters without inspection, in the eye of the law. The examination required is more than physical inspection.

Immigration Law — Courts.

11. The power of courts to review the action of immigration officials is limited. Differing with the Secretary of Labor as to the conclusion of fact would not give jurisdiction. The courts can interfere with this branch of the executive department only if there is not evidence upon a material fact, or if there has been some abuse of discretion.

Opinion filed September 17, 1913.

Mr. T. D. Mott for petitioner.

Mr. W. N. Landers for Commissioner of Immigration.

HAMILTON, Judge, delivered the folowing opinion:

This comes on to be heard upon the return of L. E. Evans, Commissioner of Immigration for Porto Rico, filed September 16, 1913, in reply to the petition of Guillermo Perez for writ of habeas corpus. The papers in the cause show that the respondent holds the petitioner by virtue of a warrant of deportation

Ex parte Perez.

of alien, issued by J. B. Densmore, Acting Secretary of Labor, dated August 22, 1913, containing the following language:

"Whereas, from proofs submitted to me, after due hearing before Immigrant Inspector Elbert C. Hendrix, held at San Juan, Porto Rico, I have become satisfied that the alien Guillermo Perez, who landed at the port of San Juan, Porto Rico, ex SS. Philadelphia on —— the 25th day of April, 1913, has been found in the United States in violation of the act of Congress approved February 20, 1907, amended by the act approved March 26, 1910, to wit:

"That the said alien is a member of the excluded classes in that he was a contract laborer at the time of his entry, having been induced or solicited to migrate to this country by an offer or promise of employment, or in consequence of an agreement, oral, written, or printed, expressed or implied, to perform manual labor in the United States, and that he is an assisted alien, his ticket or passage to the United States having been paid for with the money of another; and that he is unlawfully within the United States in that he secured admission by means of false and misleading statements, thereby entering without inspection, and may be deported in accordance therewith."

The petition and return show that petitioner Perez arrived at San Juan, April 25, 1913, and was permitted to land after undergoing the usual examination, and has since then been engaged as a baker at this place. On July 19 a warrant of arrest was issued by J. B. Densmore, Acting Secretary, based upon an affidavit of Roberto Quintero, and thereupon a hearing was had at San Juan, July 31, before Inspector E. C. Hendrix, at which Quintero, Perez, and other witnesses were examined, and several affidavits taken. Perez was allowed benefit of counsel, and the

Ex parte Perez.

witnesses were duly cross-examined. The record of the proceedings, including the initial affidavit and warrant, was made up and forwarded to the Department of Labor, and thereupon the warrant of deportation was issued, under which the petitioner is now held.

The gist of the return is that the petitioner is held under a warrant alleging the alien to have had his passage unlawfully paid by another, that he is a contract laborer, and that he entered the United States fraudulently. Any one of these grounds would be sufficient for the deportation of the petitioner, and the question is, How far do the facts of the case substantiate these charges under § 2 of the immigration law now in force.

The immigration laws of the United States practically begin with the act approved March 3, 1875 (18 Stat. at L. 477, chap. 141, U. S. Comp. Stat. 1901, p. 1285), but they have been enlarged by amendment and new legislation, as follows: Act approved August 3, 1882, 22 Stat. at L. p. 214, chap. 376, U. S. Comp. Stat. 1901, p. 1288; Act June 26, 1884 (§ 22 only) 23 Stat. at L. 58, chap. 121, U. S. Comp. Stat. 1901, p. 1290; Act February 26, 1885, 23 Stat. at L. 332, chap. 164, U. S. Comp. Stat. 1901, p. 1290; Act February 23, 1887, 24 Stat. at L. 414, chap. 220, U. S. Comp. Stat. 1901, p. 1290; Act October 19, 1888, 25 Stat. at L. 565, chap. 1210; Act March 3, 1891, 26 Stat. at L. 1084, chap. 551, U. S. Comp. Stat. 1901, p. 1294; Act February 15, 1893 (§ 7) 27 Stat. at L. 449, chap. 114, U. S. Comp. Stat. 1901, p. 3312; Act March 3, 1893, 27 Stat. at L. 569, chap. 206, U. S. Comp. Stat. 1901, p. 1300; Act August 18, 1894, 28 Stat. at L. 390, chap. 301, U. S. Comp. Stat. 1901, p. 1303; Act March 2, 1895, 28 Stat. at L. 780, chap. 177; Act June 6, 1900, 31 Stat. at L. 611, chap. 791; Act April 29,

Ex parte Perez.

1902, 32 Stat. at L. 176, chap. 641, U. S. Comp. Stat. 1911, p. 524; Act March 3, 1903, 32 Stat. at L. p. 1213, chap. 1012; Act March 22, 1904, 33 Stat. at L. p. 144, chap. 749; Resolution April 28, 1904, 33 Stat. at L. p. 591; Act February 3, 1905, 33 Stat. at L. p. 684, chap. 297, U. S. Comp. Stat. Supp. 1911, p. 498.

The law now governing the subject is the act approved February 20, 1907 (34 Stat. at L. 898, chap. 1134, U. S. Comp. Stat. Supp. 1911, p. 499), as amended by the act of March 26, 1910 (36 Stat. at L. 263, chap. 128, U. S. Comp. Stat. Supp. 1911, p. 501), and the recent act of March 4, 1913.

2. The policy of these laws from the beginning has been to protect the American laborer from competition that might be caused by immigration of workmen from abroad who might ask lower wages. America is indeed the refuge of the oppressed and those seeking to better their condition, but immigrants are subject to the provision that they must not be brought here by others, as well as subject to certain race limitations, such as contained in the Chinese exclusion acts.

3. The original basis of the law was to exclude those who were brought by contract to perform labor for others, and there are a number of decisions on this. In cases growing out of this law it was required that the contract in question be set out in the pleadings. United States v. Gay, 80 Fed. 254. And the contract must have been complete before the alien left his home country. United States v. Edgar, 1 C. C. A. 49, 4 U. S. App. 41, 48 Fed. 91; Moller v. United States, 6 C. C. A. 459, 13 U. S. App. 472, 57 Fed. 490. The scope and policy of the law, however, have been much broadened by the act of 1907, with the subsequent amendments, by which a prior contract is dis-

pensed with, and, while the expression "contract laborers" is retained, the persons excluded are defined to be those "who have been induced or solicited to migrate to this country by offers or promises of employment, or in consequence of agreements, oral, written or printed, express or implied, to perform labor in this country of any kind, skilled or unskilled." Sec. 2 of act of February 20, 1907.

4. The Constitution, laws, and court proceedings of the United States apply primarily to its citizens, and Congress can prescribe special proceedings, looking to immediate results rather than to lengthened investigation, in regard to aliens who seek to be admitted into the country. This rule extends further, and under § 20 includes their deportation after they have improperly secured admission. United States v. Williams, 194 U. S. 279, 48 L. ed. 979, 24 Sup. Ct. Rep. 719; Ex parte Pouliot, 196 Fed. 437. The method is set out in immigration rule 22.

Proceedings in all such cases before the immigration authorities are anomalous, and are not governed by the ordinary rules of practice and evidence. Affidavits and ex parte examinations are permitted, under safeguards provided by the act itself. Siniscalchi v. Thomas, 115 C. C. A. 501, 195 Fed. 701. Everything is reduced to writing before the local authorities, and sent up as a record to the Secretary of Labor at Washington. It becomes important, therefore, to know what was before the Secretary.

5. The Secretary, under § 20 of the immigration law, and by immigration rule 22, acted upon a record which was sent up to him. The return, as amended, shows what was comprised in this record. There is no dispute that it comprised the testi-

mony taken before Commissioner Hendrix, and no question is made as to an affidavit by the alien, filed some days subsequently, but it is insisted that the affidavit of Quintero, upon which was based the original warrant of July 19, was pleading, or otherwise preliminary to the hearing, and should not be considered as part of the evidence before the Secretary.

It is, however, clear from all the facts of the case, that this affidavit was before the Secretary. It contained letters, signed by the alien and not denied by him, of importance upon this trial. The alien had access to this affidavit at the time of his examination, and could have contradicted it in any way if he had seen proper. For the purpose of this hearing, therefore the affidavit of Quintero, dated June 30, 1913, will be considered as part of the record.

6. From a consideration of the testimony in this record it appears that one Monsabert was contemplating starting a bakery with Quintero as his foreman, and asked Quintero to secure a Venezuelan baker for him. They understood between them that the direct employer could not advance the passage money. Quintero, in December, 1912, by letter took up the matter with his friend, Guillermo Perez, in Venezuela, whose business was that of baker, and the two letters of Perez in evidence throw a good deal of light upon the transaction. Perez asked for details, stating that his resolution would depend upon the proposition to be made him. The work, Perez said, in his letter dated January 2, 1913, must be similar to his work in Venezuela, and the passage money would have to be advanced. He added, "You know what I mean, as you are not a fool, and have had experience, you should know what to do." The reply of Quintero could have been produced by Perez, as he said

Ex parte Perez.

he had it in Venezuela, but this was not done. Quintero, in his affidavit, states that he replied by return mail that Perez would get about $2 per day steady pay, and that passage money would be sent. Previously Quintero had written that a friend of his wanted a baker, and now says Perez could work for any of the three bakeries in San Juan. A missing letter mentioned by Quintero says Perez replied that he would come if Quintero would send the passage money. The letter of Perez dated April 5, 1913, states that Quintero's registered letter (apparently enclosing passage money) had been received, and that he would come by the next sailing of the steamship Philadelphia. He added, "I hope that I will have no trouble," and asked Quintero to expect him, Perez agreeing to do all according to his instructions, which he said were sufficiently clear. Perez arrived April 25, 1913, and, in reply to questions by the immigration authorities as to his business, he gave his occupation, not as baker, but as musician, and said that his passage was paid by himself. Quintero at once took him in charge. They had an interview that night with Monsabert, but, as the list of his employees was full at that time, Quintero secured temporary employment for Perez at another bakery. Ultimately a place was found for Perez at Monsabert's, where he remained. Quintero himself fell out with Monsabert in June, 1913, and tried to get Perez to leave, but Perez was satisfied with his place and would not go. Thereupon Quintero demanded back the passage money, which he now claimed was a loan, and subsequently undertook the proceedings before the immigration authorities which resulted in the warrant of deportation now before this court.

The evidence is perhaps not direct as to some of these facts, but they may be taken as fairly proved.

7. For reasons above stated, the view that there must be a binding prior contract cannot now be entertained as the meaning of the law. The only question is, Does the coming of Perez on the agreement of Quintero that he would "secure employment with some unmentioned bakery come within the purview of the law? The facts would seem to show that Quintero not only had one specific bakery in mind, but was acting for the head of that bakery. The fact that Perez did not know who this was could make no difference, as the name, if known, would have been that of a stranger anyway, and the facts all show that Perez did, at an early date, become an employee at Monsabert's, as had apparently been contemplated from the beginning. It would seem to come within the construction of the statute made by Attorney General Bonaparte in 26 Ops. Atty. Gen. pp. 199, 205:

"The words 'promise of employment' are evidently here used in a broad and somewhat loose sense, meaning not merely an offer of employment, which, by acceptance on the part of any alien coming within its terms, would create a contract enforceable against some definite person or persons, but any form of words which might be reasonably understood as holding out to a possible immigrant the prospect of assured employment, although they might not import any legal responsibility on the part of anyone."

To the same effect a recent text writer says:

"To constitute a contract laborer, as the term is used and defined in the present act, two facts must be shown to exist: First, that the alien has migrated to the United States, and,

Ex parte Perez.

second, that the migration is the result of an offer or promise of employment in the United States, or of an agreement to perform labor there. There seems to be no good reason why Congress should not, if it so deemed wise, prohibit this class of aliens from coming to the United States to perform labor in response to an offer too broad or too general ordinarily to give rise to a contractual obligation on the part of the person submitting it; and this, it appears, is just what Congress has done. The same may be said with regard to migration 'in consequence of agreements;' that is, that the agreement need not necessarily contain all the requisites of a formal contract. . . . The coming 'under contract' is no longer essential to a violation of the act." Bouvé, Exclusion of Aliens, p. 190.

8. The argument is plausibly made that the transaction amounted only to an invitation from Quintero to his friend to come to Porto Rico, where he was satisfied there would be employment. There would be no law to forbid this. It would merely be one immigrant finding the country a good one, and writing back to his friend to that effect. The evidence in the case, however, seems to go considerably beyond this. The whole trend of the evidence is towards Quintero acting for one particular baker, and the mention of several may well have been, considering the guarded character of the correspondence we have, to throw outsiders off, or amounts at most to showing that in a temporary emergency other employments were available, and this seems to have been exactly what occurred.

Therefore the facts in the record would tend to show that Perez was, in the sense of the law, a "contract laborer," who had "been induced or solicited to migrate to this country by offers or promises of employment, or in consequence of agree-

ments, oral, written, or printed, express or implied, to per-
form labor in this country of any kind, skilled or unskilled."
[34 Stat. at L. 899, chap. 1134, U. S. Comp. Stat. Supp. 1911,
p. 501.]

9. Another ground for deportation set out in the warrant
was that the alien's passage was paid by another, and this
may subject him to exclusion under the provision excluding
"any person whose ticket or passage is paid for with the money
of another, or who is assisted by others to come, unless it is
affirmatively and satisfactorily shown that such person does
not belong to one of the foregoing excluded classes." It will
be observed that the burden is on aliens whose passage has been
so paid, to show affirmatively and satisfactorily that they do
not belong to an excluded class. It cannot be said that Perez has
removed the burden thus placed upon him. It is not affirma-
tively and satisfactorily shown, especially in view of his own
letters in evidence, and his not producing Quintero's letters
to him, that he is not subject to exclusion. Such advance of
transportation "in any manner whatsoever," it may be noted,
is made a misdemeanor by § 4 of the immigration law.

10. The third ground of exclusion set out in the warrant
is that Perez is unlawfully in the United States in that he se-
cured admission by means of false and misleading statements,
thereby entering without inspection. It is contended for him
that he was inspected, and that the false statement he made
as to his business was not material. In other words, that his
inspection was the material point, and, as that was accom-
plished, his misstatement as to his business need not be consid-
ered.

This, however, is by no means clear. He was physically in-

Ex parte Perez.

spected, no doubt, but the officers may have been thrown off their guard by his false statement as to his business. If he had stated that he was a baker, as he was, it is possible that inquiry would have led to the discovery of the whole agreement. In fact the inference is strong that to prevent this result was the object of the false statement, and Perez's attempted explanation that baking in Porto Rico differs so from baking in Venezuela that he did not consider himself any longer a baker is not convincing. His letters show that he sought the same occupation in Porto Rico as in Venezuela, was taken it up on his arrival, and the difference in the methods he could not have learned before he left the ship. Moreover, he made the false statement that he had paid his own passage, when in point of fact the money had been sent him by Quintero. It is argued the money was his after he borrowed it, but this distinction is too fine for the purposes of the immigration laws. He had expressly requested that there be sent him "some cash in advance" for the purposes of transportation, and the evidence does not show that the money advanced was considered by the parties themselves as a loan until after the quarrel between them.

It would seem, therefore, that this, as well as the other two grounds of exclusion mentioned in the warrant, was sufficiently shown. All are covered by § 2 of the immigration law.

11. The case has been considered so far as if the matter was subject to review by this court; but in point of fact the powers of this court in the way of review are very limited. Even if the court differed in its conclusions on the evidence from the conclusions of the Secretary of Labor, it could not interfere. The subject is one which is left by Congress to a branch of the

Ex parte Perez.

Executive Department, and courts can interfere only if there is no evidence upon a material point, or if there has been some abuse of discretion. The court cannot say that there has been any abuse of discretion, nor can it say that there is any point necessary to the decision of the Secretary, upon which there is not some evidence or some fair inference possible from the facts in evidence. Prentis v. Stathakos, 112 C. C. A. 607, 192 Fed. 469; Prentis v. DiGiacomo, 112 C. C. A. 605, 192 Fed. 468, 469; Nishimura Ekiu v. United States, 142 U. S. 651, 35 L. ed. 1146, 12 Sup. Ct. Rep. 336; Prentis v. Cosmas, 116 C. C. A. 419, 196 Fed. 372; Frick v. Lewis, 115 C. C. A. 493, 195 Fed. 693–696; United States ex rel. Rosen v. Williams, 118 C. C. A. 632, 200 Fed. 538–541; Ex parte Pouliot, 196 Fed. 441.

It follows, therefore, under § 21 of the immigration law, that the writ of habeas corpus must be quashed, and the alien remanded to the custody of the immigration authorities.