# NISHIMURA EKIU v. UNITED STATES.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT ·OF CALIFORNIA.

No. 1393. Argued and submitted December 16, 1891. — Decided January 18, 1892.

The act of March 3, 1891, c. 551, forbidding certain classes of alien immi-grants to land in the United States, is constitutional and valid.

Upon a writ of *habeas corpus*, if sufficient ground for the prisoner's deten-tion by the government is shown, he is not to be discharged for defects. in the original arrest or commitment.

Inspectors of immigration under the act of March 3, 1891, c. 551, are to be appointed by the Secretary of the Treasury.

The decision of an inspector of immigration, within the authority conferred upon him by the act of March 3, 1891, c. 551, that an alien immigrant shall not be permitted to land, because within one of the classes specified in that act, is final and conclusive against his right to land, except upon appeal to the commissioner of immigration and the Secretary of the Treasury; and cannot be reviewed on *habeas corpus*, even if it is not shown that the inspector took or recorded any evidence on the question.

HABEAS CORPUS, sued out May 13, 1891, by a female subject of the Emperor of Japan, restrained of her liberty and detained at San Francisco upon the ground that she should not be permitted to land in the United States. The case, as appearing by the papers filed, and by the report of a commissioner of the Circuit Court, to whom the case was referred by that court "to find the facts and his conclusions of law, and to report a judgment therein," and by the admissions of counsel at the argument in this court, was as follows:

The petitioner arrived at the port of San Francisco on the steamship Belgic from Yokohama, Japan, on May 7, 1891. William H. Thornley, commissioner of immigration of the State of California, and claiming to act under instructions from and contract with the Secretary of the Treasury of the United States, refused to allow her to land; and on May 13, 1891, in a "report of alien immigrants forbidden to land under the provisions of the act of Congress approved August 3, 1882, at the port of San Francisco, being passengers upon the steamer Belgic, Walker, master, which arrived May 7, 1891, from Yokohama," made these statements as to the petitioner: "Sex, female. Age, 25." "Passport states that she comes to San Francisco in company with her husband, which is not a fact. She states that she has been married two years, and that her husband has been in the United States one year, but she does not know his address. She has $22, and is to stop at some hotel until her husband calls for her."

With this report Thornley sent a letter to the collector, stating that after a careful examination of the alien immigrants on board the Belgic he was satisfied that the petitioner and five others were "prohibited from landing by the existing

immigration laws," for reasons specifically stated with regard to each; and that, pending the collector's final decision as to their right to land, he had "placed them temporarily in the Methodist Chinese Mission, as the steamer was not a proper place to detain them, until the date of sailing." On the same day the collector wrote to Thornley, approving his action.

Thereafter, on the same day, this writ of *habeas corpus* was issued to Thornley, and he made the following return thereon: "In obedience to the within writ I hereby produce the body of Nishimura Ekiu, as within directed, and return that I hold her in my custody by direction of the customs authorities of the port of San Francisco, California, under the provisions of the immigration act; that by an understanding between the United States attorney and the attorney for petitioner, said party will remain in the custody of the Methodist Episcopal Japanese and Chinese Mission pending a final disposition of the writ." The petitioner remained at the mission house until the final order of the Circuit Court.

Afterwards, and before a hearing, the following proceedings took place: On May 16 the District Attorney of the United States intervened in opposition to the writ of *habeas corpus*, insisting that the finding and decision of Thornley and the collector were final and conclusive, and could not be reviewed by the court. John L. Hatch, having been appointed on May 14, by the Secretary of the Treasury, inspector of immigration at the port of San Francisco, on May 16 made the inspection and examination required by the act of March 3, 1891, c. 551, entitled "An act in amendment to the various acts relative to immigration and the importation of aliens under contract or agreement to perform labor," (the material provisions of which are set out in the margin,[1]) and refused to

---

[1] SEC. 1. "The following classes of aliens shall be excluded from admission into the United States, in accordance with the existing acts regulating immigration, other than those concerning Chinese laborers: All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome or a dangerous contagious disease, persons who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude," &c.

allow the petitioner to land, and made a report to the collector in the very words of Thornley's report, except in stating

---

By sections 3 and 4, certain offences are defined and subjected to the penalties imposed by the act of February 26, 1885, c. 164, § 3, namely, penalties of $1000, " which may be sued for and recovered by the United States, or by any person who shall first bring his action therefor," " as debts of like amount are now recovered in the Circuit Courts of the United States, the proceeds to be paid into the Treasury of the United States." 23 Stat. 333.

SEC. 6. " Any person, who shall bring into or land in the United States by vessel or otherwise, or who shall aid to bring into or land in the United States by vessel or otherwise, any alien not lawfully entitled to enter the United States, shall be deemed guilty of a misdemeanor, and shall, on conviction, be punished by a fine not exceeding one thousand dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment."

SEC. 7. " The office of superintendent of immigration is hereby created and established, and the President, by and with the advice and consent of the Senate, is authorized and directed to appoint such officer, whose salary shall be four thousand dollars per annum, payable monthly. The superintendent of immigration shall be an officer in the Treasury Department, under the control and supervision of the Secretary of the Treasury, to whom he shall make annual reports in writing of the transactions of his office, together with such special reports in writing as the Secretary of the Treasury shall require."

SEC. 8. " Upon the arrival by water at any place within the United States of any alien immigrants it shall be the duty of the commanding officer and the agents of the steam or sailing vessel by which they came to report the name, nationality, last residence and destination of every such alien, before any of them are landed, to the proper inspection officers, who shall thereupon go or send competent assistants on board such vessel and there inspect all such aliens, or the inspection officers may order a temporary removal of such aliens for examination at a designated time and place, and then and there detain them until a thorough inspection is made. But such removal shall not be considered a landing during the pendency of such examination. The medical examination shall be made by surgeons of the marine hospital service. In cases where the services of a marine hospital surgeon cannot be obtained without causing unreasonable delay the inspector may cause an alien to be examined by a civil surgeon, and the Secretary of the Treasury shall fix the compensation for such examination. The inspection officers and their assistants shall have power to administer oaths, and to take and consider testimony touching the right of any such aliens to enter the United States, all of which shall be entered of record. During such inspection after temporary removal the superintendent shall cause such aliens to be properly housed, fed and cared for, and also, in his discretion, such as are

the date of the act of Congress, under which he acted, as March 3, 1891, instead of August 3, 1882; and on May 18,

---

delayed in proceeding to their destination after inspection. All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury. It shall be the duty of the aforesaid officers and agents of such vessel to adopt due precautions to prevent the landing of any alien immigrant at any place or time other than that designated by the inspection officers; and any such officer or agent or person in charge of such vessel, who shall either knowingly or negligently land or permit to land any alien immigrant at any place or time other than that designated by the inspection officers, shall be deemed guilty of a misde-meanor, and punished by a fine not exceeding one thousand dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment."

"The Secretary of the Treasury may prescribe rules for inspection along the borders of Canada, British Columbia and Mexico so as not to obstruct or unnecessarily delay, impede or annoy passengers in ordinary travel between said countries: Provided, that not exceeding one inspector shall be appointed for each customs district, and whose salary shall not exceed twelve hundred dollars per year.

" All duties imposed and powers conferred by the second section of the act of August third, eighteen hundred and eighty-two, upon state commissioners, boards or officers acting under contract with the Secretary of the Treasury, shall be performed and exercised, as occasion may arise, by the inspection officers of the United States."

SEC. 10. "All aliens who may unlawfully come to the United States shall, if practicable, be immediately sent back on the vessel by which they were brought in. The cost of their maintenance while on land, as well as the expense of the return of such aliens, shall be borne by the owner or owners of the vessel on which such aliens came; and if any master, agent, consignee or owner of such vessel shall refuse to receive back on board the vessel such aliens, or shall neglect to detain them thereon, or shall refuse or neglect to return them to the port from which they came, or to pay the cost of their maintenance while on land, such master, agent, consignee or owner shall be deemed guilty of a misdemeanor, and shall be punished by a fine not less than three hundred dollars for each and every offence; and any such vessel shall not have clearance from any port of the United States while any such fine is unpaid."

Sec. 11 provides for the return within one year of any alien coming into the United States in violation of law.

Sec. 12 saves all prosecutions and proceedings, criminal or civil, begun under any act hereby amended.

By sec. 13 the Circuit and District Courts of the United States are " in-

Hatch intervened in opposition to the writ of *habeas corpus*, stating these doings of his, and that upon said examination he found the petitioner to be "an alien immigrant ·from Yokohama, Empire of Japan," and "a person without means of support, without relatives or friends in the United States," and "a person unable to care for herself, and liable to become a public charge, and therefore inhibited from landing under the provisions of said act of 1891, and previous acts of which said act is amendatory;" and insisting that his finding and decision were reviewable by the superintendent of immigration and the Secretary of the Treasury only.

At the hearing before the commissioner of the Circuit Court, the petitioner offered to introduce evidence as to her right to land; and contended that the act of 1891, if construed as vesting in the officers named therein exclusive authority to determine that right, was in so far unconstitutional, as depriving her of her liberty without due process of law; and that by the Constitution she had a right to the writ of *habeas corpus*, which carried with it the right to a determination by the court as to the legality of her detention, and therefore, necessarily, the right to inquire into the facts relating thereto.

The commissioner excluded the evidence offered as to the petitioner's right to land; and reported that the question of that right had been tried and determined by a duly constituted and competent tribunal having jurisdiction in the premises; that the decision of Hatch as inspector of immigration was conclusive on the right of the petitioner to land, and could not be reviewed by the court, but only by the commissioner of immigration and the Secretary of the Treasury; and that the petitioner was not unlawfully restrained of her liberty.

On July 24, 1891, the Circuit Court confirmed its commissioner's report, and ordered "that she be remanded by the marshal to the custody from which she has been taken, to wit, to the custody of J. L. Hatch, immigration inspector for the port of San Francisco, to be dealt with as he may find that

vested with full and concurrent jurisdiction of all causes, civil and criminal, arising under any of the provisions of this act;" and the act is to go into effect on April 1, 1891. 26 Stat. 1084–1086.

the law requires upon either the present testimony before him, or that and such other as he may deem proper to take." The petitioner appealed to this court.

*Mr. Lyman I. Mowry,* for appellant, submitted on his brief.

Intervenor Hatch had no power or authority in the premises: first, because he was not legally and properly appointed an inspector of immigration; and second, because the petitioner was ashore and within the United States before his appointment.

The act of March 3, 1891, creates a bureau of immigration, and provides for the appointment by the President of the United States, by and with the advice and consent of the senate, of a superintendent of immigration, who shall have his office in the city of Washington. As there is no provision in the act for the appointment of inspectors of immigration, such appointment would necessarily, and by the universal practice of the government be in the superintendent of immigration as the head of the department of immigration. The superintendent of immigration was appointed by the President long after the appointment of Hatch by the Secretary of the Treasury, and long after Hatch had decided upon the rights of the petitioner.

The petitioner having been brought ashore and within the United States by Thornley, there was nothing for Hatch to act upon, because if he were legally appointed inspector of immigration his examination must be made on board of the ship or after removal by him from the ship temporarily for examination. He had no power or authority to examine into the status of aliens already ashore in the United States.

Neither Thornley, Hatch nor the collector of the customs obeyed the instructions of the act of March 3, 1891.

That act says: " The inspection officers and their assistants shall have power to administer oaths and to take and consider testimony touching the rights of any such aliens to enter the United States, all of which shall be entered of record." There is in this case no such record as is contemplated by the statute.

The evidence shows the whole record made by Thornley, Hatch and the collector, and that consists of Thornley's letter to the collector, the collector's reply, Thornley's report to the collector and Hatch's report to the collector. There is nothing in this record that shows that either Thornley, Hatch or the collector administered any oaths, took or considered any testimony touching the rights of the petitioner to enter the United States or entered the same of record. Thornley's letter to the collector shows that he intended to take testimony, because he removed Nishimura Ekiu from the ship to the mission home, but Hatch received his appointment on the day following the removal, and Thornley then ceased to act. It is evident from an examination of his report to the collector that Hatch did nothing but make a stereotyped copy of Thornley's report.

The reports of Thornley and Hatch and the letter of the collector thereto attached show that the decisions of Thornley, Hatch and the collector were arbitrary, irregular and without testimony.

The powers conferred upon inspectors by the act are of such an extraordinary and far-reaching character, that it was the evident intention of Congress that such a record of their proceedings should be kept, as would be of some service to the government in case diplomatic complications should arise from the execution of the law.

Notwithstanding that some of the cases heretofore cited hold that the decision of the inspector upon the facts is not reviewable by the courts, yet the court did inquire into the facts in the cases of Cummings, Dietze and Bucciarello. *In re Cummings*, 32 Fed. Rep. 75; *In re Dietze*, 40 Fed. Rep. 324; *In re Bucciarello*, 45 Fed. Rep. 463.

*Mr. Assistant Attorney General Parker* for appellees.

MR. JUSTICE GRAY, after stating the case as above, delivered the opinion of the court.

As this case involves the constitutionality of a law of the United States, it is within the appellate jurisdiction of this

court, notwithstanding the appeal was taken since the act establishing Circuit Courts of Appeals took effect. Act of March 3, 1891, c. 517, § 5; 26 Stat. 827, 828, 1115.

It is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe. Vattel, lib. 2, §§ 94, 100; 1 Phillimore (3d ed.) c. 10, § 220. In the United States this power is vested in the national government, to which the Constitution has committed the entire control of international relations, in peace as well as in war. It belongs to the political department of the government, and may be exercised either through treaties made by the President and Senate, or through statutes enacted by Congress, upon whom the Constitution has conferred power to regulate commerce with foreign nations, including the entrance of ships, the importation of goods and the bringing of persons into the ports of the United States; to establish a uniform rule of naturalization; to declare war, and to provide and maintain armies and navies; and to make all laws which may be necessary and proper for carrying into effect these powers and all other powers vested by the Constitution in the government of the United States or in any department or officer thereof. Constitution, art. 1, sec. 8; *Head Money Cases*, 112 U. S. 580; *Chae Chan Ping* v. *United States*, 130 U. S. 581, 604–609.

The supervision of the admission of aliens into the United States may be entrusted by Congress either to the Department of State, having the general management of foreign relations, or to the Department of the Treasury, charged with the enforcement of the laws regulating foreign commerce; and Congress has often passed acts forbidding the immigration of particular classes of foreigners, and has committed the execution of these acts to the Secretary of the Treasury, to collectors of customs and to inspectors acting under their authority. See, for instance, acts of March 3, 1875, c. 141; 18 Stat. 477; August 3, 1882, c. 376; 22 Stat. 214; February 23, 1887, c.

220 ; 24 Stat. 414; October 19, 1888, c. 1210 ; 25 Stat. 566; as well as the various acts for the exclusion of the Chinese.

An alien immigrant, prevented from landing by any such officer claiming authority to do so under an act of Congress, and thereby restrained of his liberty, is doubtless entitled to a writ of *habeas corpus* to ascertain whether the restraint is lawful. *Chew Heong* v. *United States*, 112 U. S. 536 ; *United States* v. *Jung Ah Lung*, 124 U. S. 621 ; *Wan Shing* v. *United States*, 140 U. S. 424; *Lau Ow Bew, Petitioner*, 141 U. S. 583. And Congress may, if it sees fit, as in the statutes in question in *United States* v. *Jung Ah Lung*, just cited, authorize the courts to investigate and ascertain the facts on which the right to land depends. But, on the other hand, the final determination of those facts may be entrusted by Congress to executive officers; and in such a case, as in all others, in which a statute gives a discretionary power to an officer, to be exercised by him upon his own opinion of certain facts, he is made the sole and exclusive judge of the existence of those facts, and no other tribunal, unless expressly authorized by law to do so, is at liberty to reëxamine or controvert the sufficiency of the evidence on which he acted. *Martin* v. *Mott*, 12 Wheat. 19, 31 ; *Philadelphia & Trenton Railroad* v. *Stimpson*, 14 Pet. 448, 458 ; *Benson* v. *McMahon*, 127 U. S. 457 ; *In re Oteiza*, 136 U. S. 330. It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government. As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law. *Murray* v. *Hoboken Co.*, 18 How. 272 ; *Hilton* v. *Merritt*, 110 U. S. 97.

The immigration act of August 3, 1882, c. 376, which was held to be constitutional in the *Head Money Cases*, above cited, imposed a duty of fifty cents for each alien passenger coming by vessel into any port of the United States, to be

paid to the collector of customs, and by him into the Treasury, to constitute an immigrant fund; by § 2, the Secretary of the Treasury was charged with the duty of executing the provisions of the act, and with the supervision of the business of immigration to the United States, and, for these purposes, was empowered to make contracts with any state commission, board or officers, and it was made their duty to go on board vessels and examine the condition of immigrants, "and if on such examination there shall be found among such passengers any convict, lunatic, idiot or any person unable to take care of himself or herself without becoming a public charge, they shall report the same in writing to the collector of such port, and such persons shall not be permitted to land;" and by § 3, the Secretary of the Treasury was authorized to establish rules and regulations, and to issue instructions, to carry out this and other immigration laws of the United States.    22 Stat. 214.

The doings of Thornley, the state commissioner of immigration, in examining and detaining the petitioner, and in reporting to the collector, appear to have been under that act, and would be justified by the second section thereof, unless that section should be taken to have been impliedly repealed by the last paragraph of section 8 of the act of March 3, 1891, c. 551, by which all duties imposed and powers conferred by that section upon state commissions, boards or officers, acting under contract with the Secretary of the Treasury, "shall be performed and exercised, as occasion may arise, by the inspection officers of the United States."    26 Stat. 1085.

But it is unnecessary to express a definite opinion on the authority of Thornley to inspect and detain the petitioner.

Putting her in the mission house, as a more suitable place than the steamship, pending the decision of the question of her right to land, and keeping her there, by agreement between her attorney and the attorney for the United States, until final judgment upon the writ of *habeas corpus*, left her in the same position, so far as regarded her right to land in the United States, as if she never had been removed from the steamship.

Before the hearing upon the writ of *habeas corpus*, Hatch

was appointed by the Secretary of the Treasury inspector of immigration at the port of San Francisco, and, after making the inspection and examination required by the act of 1891, refused to allow the petitioner to land, and made a report to the collector of customs, stating facts which tended to show, and which the inspector decided did show, that she was a "person likely to become a public charge," and so within one of the classes of aliens "excluded from admission into the United States" by the first section of that act. And Hatch intervened in the proceedings on the writ of *habeas corpus*, setting up his decision in bar of the writ.

A writ of *habeas corpus* is not like an action to recover damages for an unlawful arrest or commitment, but its object is to ascertain whether the prisoner can lawfully be detained in custody; and if sufficient ground for his detention by the government is shown, he is not to be discharged for defects in the original arrest or commitment. *Ex parte Bollman & Swartwout*, 4 Cranch, 75, 114, 125; *Coleman* v. *Tennessee*, 97 U. S. 509, 519; *United States* v. *McBratney*, 104 U. S. 621, 624; *Kelley* v. *Thomas*, 15 Gray, 192; *The King* v. *Marks*, 3 East, 157; *Shuttleworth's Case*, 9 Q. B. 651.

The case must therefore turn on the validity and effect of the action of Hatch as inspector of immigration.

Section 7 of the act of 1891 establishes the office of superintendent of immigration, and enacts that he "shall be an officer in the Treasury Department, under the control and supervision of the Secretary of the Treasury." By § 8 "the proper inspection officers" are required to go on board any vessel bringing alien immigrants and to inspect and examine them, and may for this purpose remove and detain them on shore, without such removal being considered a landing; and "shall have power to administer oaths, and to take and consider testimony touching the right of any such aliens to enter the United States, all of which shall be entered of record;" "all decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary

of the Treasury;" and the Secretary of the Treasury may prescribe rules for inspection along the borders of Canada, British Columbia and Mexico, "provided that not exceeding one inspector shall be appointed for each customs district."

It was argued that the appointment of Hatch was illegal because it was made by the Secretary of the Treasury, and should have been made by the superintendent of immigration. But the Constitution does not allow Congress to vest the appointment of inferior officers elsewhere than "in the President alone, in the courts of law or in the heads of departments;" the act of 1891 manifestly contemplates and intends that the inspectors of immigration shall be appointed by the Secretary of the Treasury; and appointments of such officers by the superintendent of immigration could be upheld only by presuming them to be made with the concurrence or approval of the Secretary of the Treasury, his official head. Constitution, art. 2, sec. 2; *United States* v. *Hartwell,* 6 Wall. 385; *Stanton* v. *Wilkeson,* 8 Ben. 357; *Price* v. *Abbott,* 17 Fed. Rep. 506.

It was also argued that Hatch's proceedings did not conform to section 8 of the act of 1891, because it did not appear that he took testimony on oath, and because there was no record of any testimony or of his decision. But the statute does not require inspectors to take any testimony at all, and allows them to decide on their own inspection and examination the question of the right of any alien immigrant to land. The provision relied on merely empowers inspectors to administer oaths and to take and consider testimony, and requires only testimony so taken to be entered of record.

The decision of the inspector of immigration being in conformity with the act of 1891, there can be no doubt that it was final and conclusive against the petitioner's right to land in the United States. The words of section 8 are clear to that effect, and were manifestly intended to prevent the question of an alien immigrant's right to land, when once decided adversely by an inspector, acting within the jurisdiction conferred upon him, from being impeached or reviewed, in the courts or otherwise, save only by appeal to the inspector's

official superiors, and in accordance with the provisions of the act. Section 13, by which the Circuit and District Courts of the United States are "invested with full and concurrent jurisdiction of all causes, civil and criminal, arising under any of the provisions of this act," evidently refers to causes of judicial cognizance, already provided for, whether civil actions in the nature of debt for penalties under sections 3 and 4, or indictments for misdemeanors under sections 6, 8 and 10. Its intention was to vest concurrent jurisdiction of such causes in the Circuit and District Courts; and it is impossible to construe it as giving the courts jurisdiction to determine matters which the act has expressly committed to the final determination of executive officers.

The result is, that the act of 1891 is constitutional and valid; the inspector of immigration was duly appointed; his decision against the petitioner's right to land in the United States was within the authority conferred upon him by that act; no appeal having been taken to the superintendent of immigration, that decision was final and conclusive; the petitioner is not unlawfully restrained of her liberty; and the

*Order of the Circuit Court is affirmed.*

MR. JUSTICE BREWER dissented.