Application of Gyula PAKTOROVICS, Szeren Paktorovics, Natasha Paktorovics, Vera Paktorovics, for a Writ of Habeas Corpus.

UNITED STATES of America ex rel. Gyula PAKTOROVICS, Szeren Paktorovics, Natasha Paktorovics and Vera Paktorovics, Relators,

v.

John L. MURFF, District Director, Immigration and Naturalization Service, for the District of New York, Respondent.

United States District Court
S. D. New York.

Nov. 26, 1957.

Ralph Goldstein, New York City, for relators. Edward J. Ennis, New York City, of counsel.

Paul W. Williams, U. S. Atty., S. D., New York, New York City, for respondent. Roy Babitt, Sp. Asst. U. S. Atty., New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

Relators, Gyula Paktorovics, his wife, Szeren Paktorovics, and their two minor daughters are purported fugitives from the terrorism and persecution imposed upon the Hungarian people by Russia's brutal suppression of the insurrection that swept Hungary in the fall of 1956. Fleeing to Austria the relators were there interviewed by American Immigration Officers for possible admission into the United States. Upon request of American officials Gyula Paktorovics executed a written application in the English and Hungarian language for parole into the United States for himself and his family pursuant to Section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C.A. § 1182(d) (5)). This application was approved and the Paktorovics family was paroled into the United States. They arrived here December 24, 1956 and settled in Baltimore where the husband obtained employment as a milkman.

Beginning in February 1957, the husband was interrogated on several occasions by the officers of the Immigration and Naturalization Service. At one of these meetings he admitted membership in the Communist Party from 1954 until the day he left Hungary for Austria. When confronted with his application for parole, executed in Austria, in which he acknowledged membership in the Party only up to 1949, the male relator conceded the inconsistency and stated he withheld information of his subsequent Communist affiliation in fear that such a revelation would result in a denial of his application. As a result of the information gleaned from this interview the Acting Regional Commissioner for the South Eastern Region of the Immi-

gration and Naturalization Service of Richmond, Virginia, entered an order on August 14, 1957, revoking his temporary parole upon the ground that he had misrepresented material facts to the American authorities in Austria bearing upon his application for admission to the United States and ordered that the necessary steps be taken to insure his return to Austria. In the interest of maintaining the family unit, the Commissioner further decreed the revocation of the parole of the wife and two children so that they could accompany the husband and father back to Austria.

Relators were subsequently taken into custody in Baltimore and transferred to the immigration detention station in New York to await return to Austria.

On August 26, 1957, the husband petitioned for a writ of habeas corpus on the ground that his expulsion from the United States without a hearing was a violation of due process of law. Thereupon and prior to the return of the writ the Immigration Service invoked Section 235(c) of the Act (8 U.S.C.A. § 1225(c)), providing for expulsion of an alien without a hearing where inadmissibility is based on confidential information which would be inimical to public welfare and the Acting Regional Commissioner found the relators excludable under Section 212(a) (28) of the Act. 8 U.S.C.A. § 1182(a) (28) (for past membership in the Communist Party). Subsequently upon reexamination the Acting Commissioner determined that there was sufficient basis for the exclusion of relators apart from confidential information and withdrew the exclusion order without a hearing agreeing to grant such a hearing pursuant to Section 236 (8 U.S.C.A. § 1226).[1] Thereafter, by stipulation the writ of habeas corpus seeking a hearing was dismissed.

At the 236 hearing at which the relators were represented by counsel, the in-quiry was confined, over the strong protestations of counsel, to the question of whether the immigrants were in possession of valid unexpired entry documents. This question being determined in the negative, relators were found inadmissible under Section 212(a) (20) (8 U.S.C.A. § 1182(a) (20)). An appeal from this order was dismissed by the Board of Immigration Appeals and the relators have been taken into custody for the execution of the exclusion order.

By the instant petition for habeas corpus relators challenge the constitutionality of the above proceedings on grounds that: (1) Revocation of parole without a hearing is a denial of due process of law; (2) An exclusion hearing limited only to the question of possession of entry documents is denial of due process of law, and (3) Revocation of temporary parole and attempted exclusion of the wife and daughters because of their relationship to the husband without asserting any case against them is arbitrary and capricious and denial of due process of law.

I shall consider these contentions seriatim.

## I.

The relators were paroled into the United States under Section 212(d) (5) of the Immigration and Nationality Act, 8 U.S.C.A. § 1182(d) (5). That section provides as follows:

"The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be re-

---

[1.] Thereafter and throughout the subsequent proceedings the Immigration Service has abandoned the use of confidential information as a ground for revocation and exclusion and has relied exclusively on the alleged misrepresentations and lack of entry documents.

turned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."

■ The unrest and chaos in Austria which came about as a result of the insurrection of the Hungarian people in the fall of 1956, constituted a sufficient emergent reason for the parole of deserving bona fide Hungarian refugees, pending such appropriate legislation as Congress might enact to clarify their status. The initial screening process in Austria, designed to select only those deserving of refuge in the United States, was conducted under a setting which called for urgency in relocating the great sea of refugees that had inundated Austria. Consequently, this initial screening process was by necessity incomplete at best and it was expected that further screening would be continued in this country. It is relators' contention that revocation of the parole provisionally granted in Austria, cannot consistent with due process be accomplished without a full-fledged hearing.

■ In considering the scope of the due process clause in this context, it is necessary to carefully distinguish a resident alien physically present in the United States who is within the full protection of the constitution and the alien regarded in contemplation of law as outside the country who stands outside the full reach of the Fifth Amendment. Compare Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956; United States ex rel. Knauff v. Shaughnessy, 1950, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 with

Kwong Hai Chew v. Colding, 1953, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576. The alien outside the country seeking admission does not do so under any claim of right. Admission to the United States is a privilege granted by the sovereign United States Government only upon such terms as Congress shall prescribe. Consequently, where an alien is treated as being physically outside the country, any due process required in exclusion proceedings is co-extensive with the procedure authorized by Congress. Brownell v. Tom We Shung, 1956, 352 U.S. 180, 182, note 1, 77 S.Ct. 252, 1 L.Ed.2d 225; United States ex rel. Knauff v. Shaughnessy, supra, 338 U.S. at pages 543–544, 70 S.Ct. 309, 94 L.Ed. 317; Nishimura Ekiu v. United States, 1892, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146; Ludecke v. Watkins, 1948, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 881.

■■ An arriving alien's temporary harborage ashore pending determination of his admissibility is an act of grace and bestows no additional rights. Where Congress has prescribed that an alien's shelter ashore "shall not be considered a landing" the courts have "long considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border." Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 215, 73 S.Ct. 625, 631, 97 L.Ed. 956. Since § 212(d) (5) explicitly directs that parole is not to be regarded as an admission into the United States, it must be treated as simply an enlargement of the bounds of such shelter ashore. The paroled alien remains "still in theory of law at the boundary line" and has "gained no foothold in the United States" until lawfully admitted.[2] It follows that any rights a

---

2. Kaplan v. Tod, 1925, 267 U.S. 228, 45 S.Ct. 257, 69 L.Ed. 585; United States ex rel. Lue Chow Yee v. Shaughnessy, D.C.S.D.N.Y.1956, 146 F.Supp. 3, affirmed, 2 Cir., 1957, 245 F.2d 874; Dong Wing Ott v. Shaughnessy, D.C.S.D.N.Y. 1956, 142 F.Supp. 379, affirmed, 2 Cir., 245 F.2d 875, rehearing granted and reaffirmed, 2 Cir., 1957, 247 F.2d 769; Leng May Ma v. Barber, 9 Cir., 1957, 241 F.2d

85, certiorari granted, 1957, 353 U.S. 981, 77 S.Ct. 1283, 1 L.Ed.2d 141. Those District of Columbia cases Ng Lin Chong v. McGrath, 1952, 91 U.S.App. D.C. 131, 202 F.2d 316 and Quan v. Brownell, D.C.Cir., 1957, 248 F.2d 89 to the contrary have been disapproved by the Second Circuit. See Dong Wing Ott v. Shaughnessy, on rehearing, supra.

parolee may have are not derived from the Constitution but are limited solely to those rights and privileges which Congress in its wisdom sought to confer.

■ I must therefore examine the statutory design of § 212(d) (5) to ascertain whether Congress contemplated a hearing in these situations. If the statutory procedure is followed the relators will have been accorded all the due process required. It is significant in this respect that in the Immigration and Nationality Act, Congress elsewhere provided for a hearing procedure in determining alien admissibility or excludability (Sections 235(a) (b), 236, 242(b) of the Immigration and Nationality Act, 8 U.S.C.A. §§ 1225(a) (b), 1226, 1252 (b)) without making reference to the temporary parole provisions. The fact that both the parole provisions and the applicable regulations thereunder are conspicuously silent on this point is certainly evidence of both a Congressional and Executive intent to withhold a hearing as of right. See Jay v. Boyd, 1956,

351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242. Absent this Congressional intent, the relators cannot insist upon a hearing.[3] To argue as do relators that a right to a hearing should be read into the statute as the only course consistent with the tradition and principles of free government is to flout the meaning we have ascribed to Congressional intent. Jay v. Boyd, supra, 351 U.S. at page 357, 76 S.Ct. 919, 100 L.Ed. 1242.

However, in this case, I need not rest my decision on the absence of Congressional intent to provide an inquiry procedure to determine the verity of the allegations advanced by the Immigration Service. Here the male relator prior to revocation was confronted with the evidence against him. He was afforded an opportunity to explain the inconsistency between the statement in his application for parole that he left the Party in 1949 and his present admission that he re-entered the Party in 1954 and maintained such membership until his departure in 1956.[4]

3. Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956; Nishimura Ekui v. United States, supra; Ludecke v. Watkins, supra, cf. Williams v. New York, 1949, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337. Those cases which find a hearing required by due process are distinguishable on the ground that either Congress or the Attorney General has prescribed some procedures for a hearing or inquiry. Cf. United States ex rel. Giacalone v. Miller, D.C.S.D.N.Y.1949, 86 F.Supp. 655; United States ex rel. D'Istria v. Day, 2 Cir., 1927, 20 F.2d 302.

4. The pertinent exchange of questions and answers on July 11, 1957 between relator and inspector for the Immigration Service is reported as follows:

"Q. Question #13 on this application for parole relates to 'Political Organizations' and I notice that the following is written on that application, in answer to question #13: 'Involuntary member of MKP (MDP) 1947–49. Expelled (49) and interned (1949–53).' According to the information that you have voluntarily given in your interviews, would the answers to question #13 be absolutely correct, or is there some information that should be on there that is not on there? A. Yes, the answers are correct.

"Q. Didn't you say that you rejoined the MDP, which is the Hungarian Communist Party, in 1954, and that you were still a member of that organization when you left Hungary and went to Austria? A. Yes, I did say that.

"Q. Then why didn't you state on this questionnaire, in answer to question #13, that you had rejoined the Hungarian Communist Party, and that you were at the time of your escape from Hungary still an active member of the Hungarian Communist Party? A. I did not put that on the application because prior to completing this application, a group of us Hungarians had been talking and we all decided that it was best to deny being a Communist or that we were members of the Communist Party, because we would not get to America.

"Q. Do you admit that this information should have been written on your application for parole into the United States? A. Yes, because I knew that if I did not put that in the application I would not have any trouble.

"Q. Do you admit that you wilfully and knowingly concealed this information from the officials of the United States Goverment? A. Yes, but I did tell a Hungarian man in the Consul's office."

**818**

■ Though he was not afforded the opportunity of a full-fledged hearing with the benefit of counsel, I find that he was given an opportunity to explain the inconsistency and that the procedure employed was more than required by the statute and, therefore, consistent with due process. Furthermore, the reasons given by the Commissioner for revocation of parole, to wit: that the male relator intentionally withheld information, are reasons which Congress intended to make relevant to this type of procedure.[5] While recognizing that circumstances might arise warranting an independent inquiry by the courts into the sufficiency of the reasons given for revocation, such circumstances are not present in the instant proceeding. See United States ex rel. Kaloudis v. Shaughnessy, 2 Cir., 1950, 180 F.2d 489. The grounds advanced for revocation are sufficient on their face to justify the action taken. There was no manifest abuse of discretion and I am without authority to conduct an independent inquiry into the merits.

**II.**

Relators' parole having been revoked, the validity of the subsequent exclusion hearings remains to be determined.

■ As noted before, § 212(d) (5) provides that upon revocation of parole the alien shall forthwith be returned to the custody in which he was paroled and shall continue to be dealt with as any other applicant for admission to the United States. If by "application for admission" is meant application for permanent admission, the non-possession of immigration visas or other entry documents is sufficient in itself for exclusion purposes. Section 212(a) (20), 8 U.S. C.A. § 1182(a) (20). The validity of the parole revocation order, therefore, was properly held outside the scope of the exclusion hearings before the Special Inquiry Officer of the Board of Immigration Appeals. Support for this proposition can be found in the fact that Congress in providing for an inquiry procedure in exclusion cases made no mention of revocation of parole. To be sure, the regulations explicitly commit authority to revoke parole to the Regional Commissioner and not the Board of Immigration Appeals. 8 C.F.R. § 9.5(a) (g) (Supp.1957). Under such circumstances, relator's argument that the Special Inquiry Officer and the Board of Immigration Appeals should have inquired into the reasons for revocation is untenable.

■ Relators next contend that the statutory grounds for exclusion, i. e. lack of entry documents are not applicable to them, inasmuch as they are not upon revocation of parole applicants for permanent immigration, but are to be treated as temporary visitors, who have overstayed their visit and who are now entitled to the broad inquiry provided in deportation hearings.

While the parole provisions in directing that a parolee shall be treated as "an applicant for admission to the United States" upon termination of parole do not refer to the type of admission for which he is to be considered it is clear that the purpose of the statute looked toward the permanent resettling of these immigrants in the United States. See Message from the President of the United States on Immigration and Naturalization, dated January 31, 1957, 103 Cong.Rec. 1214–16. To treat these victims of Communist aggression as mere temporary transients to be shunted from country to country at will is to contradict the explicit promises and representations which we held out to the Hungarian refugees and to the world at large. It was clearly this country's purpose made pursuant to a broad humanitarian policy to provide a place of permanent asylum for these homeless refugees. I prefer to construe the terms of the Act in the light of this policy.

■ The further contention of relators to the effect that the facts and circumstances under which they were

5. The sufficiency of the reasons given for revocation of the parole of the wife and two children is considered elsewhere in this opinion.

brought to this country indicate an intention to waive the documentary requirements is entirely without merit and not borne out by the statute. The case cited by counsel in support of this proposition (United States ex rel. Bradley v. Watkins, 2 Cir., 1947, 163 F.2d 328) holds no more than that the exclusion provisions of the Immigration and Nationality Act are not applicable to a person entering this country against his will. The relators, not claiming an involuntary entry into the United States, cannot prevail on this authority.

Relators were provided with a complete and impartial hearing to determine their excludability in strict conformity with the statute. The ensuing exclusion order was based on the statutory grounds that relators were not in possession of entry documents. Congress having seen fit to treat such non-possession as sufficient reason for exclusion relators were not permitted to have other extraneous matter considered by the Board.

### III.

■■■■■ I now reach the problem posed by the wife and two children. I am of the opinion that the reasons set forth in the order revoking their parole are totally insufficient on their face and as to these relators the order should be set aside. Though the scope of judicial review of an act of discretion committed to the Attorney General is minimal, where the reasons provided are on their face capricious and arbitrary and do not involve considerations Congress intended to make relevant, the intervention of the courts is justified.[6] In this case I cannot ascribe to Congress an intent to revoke the parole of a family

merely because the husband has been found to be persona non grata and ordered excluded. True a fatherless family may not have been chosen initially for parole into the United States. Nevertheless, Congress must have considered the possibility that a family chosen for expatriation might subsequently lose the services of the head of the household through disability or death. To find a legislative intent to return a family from whence it came on the basis of such a circumstance is to impute to Congress a most inhumane disregard for the individuals concerned. Such is the situation at hand. No substantial charge has been lodged against the wife and two children. The contention that the interests of all the relators require the preservation of the family unit is a determination that should be made by the relators themselves and not by the Immigration Service. The wife and two children should certainly be afforded the opportunity of choosing for themselves whether to voluntarily accompany the husband and father back to Austria or whether they desire to remain here. Finding that their parole was improperly revoked they were not subject to exclusion for lack of documents and as to them the exclusion proceeding is voided.

The writ of habeas corpus of Gyula Paktorovics is dismissed. The parole revocation order and exclusion order insofar as they refer to the remaining relators are improper and must be set aside. As to these relators the determination of their parole status is remanded to the Acting Regional Director for the South Eastern Region for further proceedings consistent with this opinion. Settle order.

6. See United States ex rel. Kaloudis v. Shaughnessy, supra; United States ex rel. Partheniades v. Shaughnessy, D.C. S.D.N.Y.1956, 146 F.Supp. 772; Note Federal Habeas Corpus, 56 Colum.L.Rev. 551, 560 (1956). I need not consider the scope of review if the Acting Regional Commissioner had omitted to give any reason for the revocation of parole of the wife and two children. It may well be, however, that inasmuch as the actions of an administrator are presumed to be executed pursuant to lawful authority the court is powerless in this situation to inquire into the real reasons behind the Commissioner's decision. In the instant case the presumption of lawfulness is rebutted by the patently invalid reasons provided.