Edward P. **AHRENS**, District Director, Immigration and Naturalization Service, Miami, Florida, Appellant,

v.

Rolando Masferrer **ROJAS**, Appellee.

No. 18955.

United States Court of Appeals
Fifth Circuit.

June 30, 1961.

Paul E. Gifford, Asst. U. S. Atty., Miami, Fla., Douglas P. Lillis, Regional Counsel, I. & N. Service, Richmond, Va., for appellant.

Monroe Gelb, Miami, Fla., for appellee.

Before TUTTLE, Chief Judge, RIVES, Circuit Judge, and DE VANE, District Judge.

RIVES, Circuit Judge.

In an action brought under the Declaratory Judgment Act, 28 U.S.C.A. § 2201, and Section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009, the district court entered a final judgment that the plaintiff-appellee be released from custody by the defendant and "that the defendant, Edward P. Ahrens, District Director, Immigration and Naturalization Service, Miami, Florida, his agents or employees, be, and they are hereby permanently restrained and enjoined after May 1, 1961 from molesting the plaintiff, Rolando Masferrer Rojas, or from taking him into custody, or in any wise interfering with the plaintiff, except that the foregoing shall not apply to the actual deportation of the plaintiff to a country outside the United States of America." This appeal is from that judgment.

No witnesses were examined on the hearing before the district court. The undisputed facts appear to be in accord with an affidavit filed by the defendant Ahrens:

"That the plaintiff is an alien, native and citizen of Cuba, age 43, who was prominent in Cuba politics during the Batista regime;

"That after the Castro revolution, to-wit, January 1, 1959, the plaintiff fled from Cuba and applied for admission to the United States at Key West, Florida, on January 1, 1959;

"That the plaintiff was then paroled into the United States under the authority of Section 212(d) (5) of the Immigration and Nationality Act [8 U.S.C. 1182(d) (5)];

"That on March 30, 1959, the plaintiff was accorded an exclusion hearing before a Special Inquiry Officer and was by him excluded on June 11, 1959, under Section 212(a) (20) of the Immigration and Nationality Act [8 U.S.C. 1182(a) (20)] as an alien not in possession of a valid visa or passport; that the plaintiff appealed the decision of the Special Inquiry Officer to the Board of Immigration Appeals which on October 20, 1959, affirmed the said exclusion order;

"That the plaintiff was continued on parole until January 8, 1960, when he was ordered by defendant to surrender into defendant's custody on January 18, 1960, for removal from Florida and the coastal areas of the Gulf of Mexico for residence in Washington, D. C. or Baltimore, Maryland, or any other area not proximate to Florida and the coastal areas of the Gulf of Mexico;

"That plaintiff by Civil Action No. 9697 in the United States District Court for the Southern District of Florida, Miami Division, sought to resist defendant's above order requiring his surrender. The Honorable Judge Emett C. Choate by order of February 29, 1960, denied plaintiff's request for a temporary restraining order and gave him forty-eight hours within which to comply with defendant's above surrender order;

"That because of plaintiff's physical condition, the defendant allowed plaintiff to remain in Miami, Florida and did not require compliance with Judge Choate's above order;

"That on April 7, 1961, The Honorable Dean Rusk, Secretary of State, wrote The Honorable Robert F. Kennedy, The Attorney General, which original letter is attached requesting the Department of Justice and the Immigration and Naturalization Service to take action within

the law to revoke the plaintiff's parole, to deport him or to restrict his presence at large for the reason that such action would advance our foreign policy objectives; that The Attorney General, exercising the authority accorded him by law, directed the defendant to take the plaintiff into custody;

"That defendant, thereupon, assumed custody of the plaintiff who is now detained in detention facilities at the Border Patrol Headquarters, Miami, Florida;

"That on April 10, 1961, the plaintiff was indicted in the United States, District Court at Miami, Florida for conspiracy to violate the neutrality laws, to-wit, to take part in a military expedition against the Republic of Cuba;

"That in a press conference on April 13, 1961, the Honorable John F. Kennedy, President of the United States, made reference to the above indictment of the plaintiff and stated that our Government does not approve of the purpose of the plaintiff to establish a Batista-like regime in Cuba;

"That plaintiff is not as alleged in his complaint being held incommunicado but has been given every opportunity to and has conferred with his counsel and immediate family on several occasions;

"That the allegation of the complaint that plaintiff was not given notice of the revocation of his parole is incorrect; that notice was given pursuant to Title 8, Code of Federal Regulations, Section 212.5; that a copy of said notice is attached hereto."

The district court concluded that the only issue was one of law and held that the defendant, a delegate of the Attorney General, could not hold an excluded alien in custody where deportation was not imminent.

That view seems directly contrary to the holding of the Supreme Court in Shaughnessy v. U. S. ex rel. Mezei, 1953, 345 U.S. 206, 215, 216, 73 S.Ct. 625, 97 L.Ed. 956. Mezei presented a far stronger case for his release than does this plaintiff. Mezei had resided in the United States for twenty-five years before he departed and visited in Hungary for nineteen months. Upon his return, he was excluded by the Attorney General on the ground that his entry would be prejudicial to the interest of the United States. Mezei was then detained on Ellis Island for two years. He made numerous attempts to gain admission to other countries. The plaintiff here had no prior residence in the United States. He conceded that it was impossible to deport him to Cuba.[1] He had made no attempt to depart from the United States, and had rejected restrictions on his parole which would have excluded him from the State of Florida or any other area within 150 miles of the Gulf of Mexico.

In view of the plaintiff's status as an excluded alien, and the determination by the Attorney General that his further enlargement on parole would be prejudicial to the public interest, the Attorney General when unable to immediately deport him could legally hold him in custody. That much was settled in Shaughnessy v. U. S. ex rel. Mezei, supra.

The plaintiff further insists that his parole could not be revoked without according him a hearing, and for that insistence relies mainly on United States

---

1. On an exclusion hearing before a Special Inquiry Officer on April 15, 1959, the plaintiff introduced as a witness one Jose Gonzalez Puente who identified himself as a Senator of Cuba since January 28, 1955, and reelected during the election of November 1958 for the Province of Oriente. He concluded his testimony as follows:

"Q. Is there any question in your mind as to what would happen to Senator Masferrer if he were returned to Cuba at the present time? A. If the American Government should send Senator Masferrer to Cuba now they would be sending him over to be executed."

ex rel. Paktorovics v. Murff, 2 Cir., 1958, 260 F.2d 610. The majority opinion in that case by Judge Medina, concurred in by Judge Waterman, is opposed by an able and vigorous dissent of Judge Moore and is contrary to the thoroughly considered opinion of District Judge Kaufman reported in Application of Paktorovics, 156 F.Supp. 816. The majority opinion itself recognizes that case as *sui generis*,[2] and distinguishes that case from the controlling precedents as follows:

" * * * What makes this case different from other exclusion cases, such as United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 70 S. Ct. 309, 94 L.Ed. 317; Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956; Leng May Ma v. Barber, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246, and Rogers v. Quan, 357 U.S. 193, 78 S.Ct. 1076, 2 L.Ed.2d 1252, is that Paktorovics was invited here pursuant to the announced foreign policy of the United States as formulated by the President in his directive of December 1, 1956, referred to in his Message to the Congress, of January 31, 1957, from which we have already quoted. Furthermore, the Congress has recently enacted legislation endorsing the extraordinary action of the President with respect to these Hungarian refugees. See Public Law 85–559, 72 Stat. 419 (approved July 25, 1958).

"True it is that the President has no power to change the law by inviting Paktorovics and the other Hungarian refugees to come here, but this is not to say that the tender of such an invitation and its acceptance by him did not effect a change in the status of Paktorovics sufficient to entitle him to the protection of our Constitution." United States ex rel. Paktorovics v. Murff, 2 Cir., 1958, 260 F.2d 610, 614.

There are no similar distinctions in the present case. The statute under which the plaintiff was paroled into the United States is couched in clear and unmistakable terms:

"(5) The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." Title 8 U.S.C.A. § 1182(d) (5).

That statute is further implemented by Title 8, Code of Federal Regulations, Section 212.5, which reads as follows:

"Section 212.5. *Parole of aliens into the United States.* The district director in charge of a port of entry may, prior to examination by an immigration officer, or subsequent to such examination and pending a final determination of admissibility in accordance with Sections 235 and 236 of the act and this chapter, or after a finding of inadmissibility has been made, parole into the United States temporarily in accordance with Section 212(d) (5) of the act any alien applicant for admission at such port of entry under such terms and conditions, including the exaction of a bond on Term I–352, as such officer shall deem appropriate. At the expiration of the period of time or upon accomplishment of the

---

**2.** "By reason of the circumstances under which the Hungarian refugees were paroled into the United States this case

in *sui generis*." United States ex rel. Paktorovics v. Murff, 2 Cir., 1958, 260 F.2d 610, 613.

purpose for which parole was authorized or when in the opinion of the district director in charge of the area in which the alien is located that neither emergency nor public interest warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he shall be restored to the status which he had at the time of parole, and further inspection or hearing shall be conducted under Section 235 or 236 of the act and this chapter, or any order of exclusion and deportation previously entered shall be executed."

Neither the statute nor the regulation provides for a hearing on revocation of parole. The use of the term "forthwith" in the statute is not consistent with any extended hearing. The regulation clearly negatives the necessity for a hearing when it provides that:

"* * * parole shall be terminated upon written notice to the alien and he shall be restored to the status which he had at the time of parole, and further inspection or hearing shall be conducted under Section 235 or 236 of the act and this chapter, or any order of exclusion and deportation previously entered shall be executed."

■ The plaintiff had acknowledged in writing receipt of a notice "that the parole which was granted to you into the United States pursuant to Section 212(d)(5) of the Immigration and Nationality Act of 1952, dated February 6, 1961, is hereby revoked in conformity with paragraph 1 thereof which stated that the privilege was subject to revocation without prior notice."

After the receipt of that notice the plaintiff's status was the same as if he had been stopped at the border. That is made clear by the Court's opinion in Shaughnessy v. U. S. ex rel. Mezei, supra, 345 U.S. at page 215, 73 S.Ct. at page 630.

"* * * Aliens seeking entry from contiguous lands obviously can be turned back at the border without more. Polymeris v. [U. S. ex rel.] Trudell, 1932, 284 U.S. 279 [52 S.Ct. 143, 76 L.Ed. 291]. While the Government might keep entrants by sea aboard the vessel pending determination of their admissibility, resulting hardships to the alien and inconvenience to the carrier persuaded Congress to adopt a more generous course. By statute it authorized, in cases such as this, aliens' temporary removal from ship to shore.[11] But such temporary harborage, an act of legislative grace, bestows no additional rights. Congress meticulously specified that such shelter ashore 'shall not be considered a landing' nor relieve the vessel of the duty to transport back the alien if ultimately excluded.[12] And this Court has long considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border. Ekiu v. United States, 1892, 142 U.S. 651, 661–662 [12 S.Ct. 336, 339, 35 L.Ed. 1146]; United States v. Ju Toy, 1905, 198 U.S. 253, 263 [25 S.Ct. 644, 646, 49 L.Ed. 1040]; Kaplan v. Tod, 1925, 267 U.S. 228, 230 [45 S. Ct. 257, 69 L.Ed. 585].

"[11] 8 U.S.C. § 151.
"[12] 8 U.S.C. §§ 151, 154."

The purpose and effect of parole of alien applicants for admission into the United States is again explained in Leng May Ma v. Barber, 1958, 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246:

"The parole of aliens seeking admission is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status, and to hold that petitioner's parole placed her legally 'within the United States' is inconsistent with the congressional mandate, the administrative

concept of parole, and the decisions of this Court. Physical detention of aliens is now the exception, not the rule, and is generally employed only as to security risks or those likely to abscond. See Annual Reports, Immigration and Naturalization Service, 1955, pp. 5–6; 1956, pp. 5–6. Certainly this policy reflects the humane qualities of an enlightened civilization."

That case then recognizes the danger of interference by the courts in parole cases: "The acceptance of petitioner's position in this case, however, with its inherent suggestion of an altered parole status, would be quite likely to prompt some curtailment of current parole policy —an intention we are reluctant to impute to the Congress." 357 U.S. at page 190, 78 S.Ct. at page 1075.

 In revoking the plaintiff's parole there was no abuse of discretion on the part of the Attorney General. The Secretary of State had by letter dated April 7, 1961, advised the Attorney General as follows:

"Rolando Masferrer Rojas, a citizen of Cuba, is presently paroled under Section 212(d) 5 of the Immigration and Nationality Act. The continued presence at large of Rolando Masferrer in the United States and particularly in the State of Florida is prejudicial to our national interest from the point of view of our foreign relations. Any action which the Immigration and Naturalization Service can take within the law administered by the Department of Justice to revoke this alien's parole, deporting him or restricting his presence at large, would accordingly advance our foreign policy objectives."

A year and three months before receipt of such advice from the Secretary of State (on January 8, 1960), the defendant district director had notified the plaintiff:

"I have now concluded that your continued presence at large in the State of Florida or any other area within 150 miles of the Gulf of Mexico is not in the national interest. You were directed on December 21, 1959, to remove yourself by January 6, 1960, to any location of your choice not within the proscribed area. This you failed to do."

██ Even in deportation cases the courts will review the exercise of administrative discretion only upon a showing that it was arbitrary and without reasonable foundation. Carlson v. Landon, 1952, 342 U.S. 524, 540, 72 S.Ct. 525, 96 L.Ed. 547; Jay v. Boyd, 1956, 351 U.S. 345, 353, et seq., 76 S.Ct. 919, 100 L.Ed. 1242; Hintopoulos v. U. S. ex rel. Shaughnessy, 1957, 353 U.S. 72, 77, 77 S. Ct. 618, 1 L.Ed.2d 652. In exclusion cases the courts have no power not expressly granted by Congress. As said in U. S. ex rel. Knauff v. Shaughnessy, 1950, 338 U.S. 537, 542, 543, 70 S.Ct. 309, 312, 94 L.Ed. 317:

"* * * The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation. * * * When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.

"Thus the decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General. The action of the executive officer under such authority is final and conclusive. Whatever the rule may be concerning deportation of persons who have gained entry into the United States, it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien."

In answer to questions on oral argument, we were informed that all or practically all of the thousands of refugees from Cuba now resident in Florida were paroled into the United States under the authority of this same statute. That they remain at the unfettered discretion of the Attorney General shows that extraordinary and awesome power and responsibility are vested in that official. The present case gives no indication of any abuse of that authority. We feel confident that if abuses should arise a watchful Congress will promptly provide appropriate remedial action.

The judgment of the district court is reversed with directions that judgment be entered dismissing the complaint and returning the plaintiff to the custody of the defendant.

Reversed with directions.