**Hamid R. KASHANI,**
**Plaintiff-Appellant,**

v.

**Alan NELSON, Immigration and Naturalization Service,**
**Defendant-Appellee.**

No. 84–2960.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 12, 1985.

Decided June 12, 1986.

Ripple, Circuit Judge, filed concurring opinion.

William E. Marsh, Ind. Univ. School of Law-Indianapolis, Indianapolis, Ind., for plaintiff-appellant.

Mary Reed, Office of Immigration Litigation, Civil Div., Dept. of Justice, Washington, D.C., for defendant-appellee.

Before COFFEY, FLAUM, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

The plaintiff appeals the district court's dismissal of his complaint seeking judicial review of the district director of Immigration and Naturalization Service's denial of his request for political asylum and for a preliminary injunction enjoining the Immigration and Naturalization Service from

taking any further action to deport him from the United States. We affirm.

## I.

The plaintiff, Hamid Kashani, an Iranian national, entered the United States on January 4, 1976 with non-immigrant student status pursuant to an "F–1" visa authorizing his entry to attend the School of Engineering at Purdue University in Lafayette, Indiana. Kashani completed his studies on July 10, 1982 and on October 14, some three months later, filed a Request for Asylum with the District Director of the Immigration and Naturalization Service ("INS") pursuant to § 208 of the Immigration and Nationality Act ("INA" or "Act"), 8 U.S.C. § 1158(a). Section 208 provides that an alien may be granted asylum if he is a refugee within the meaning of § 101(a)(42)(A) of the Act [8 U.S.C. § 1101(a)(42)(A)], which defines a refugee as:

> "Any person who is outside any country of such person's nationality or, in the case of the person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...."

To establish a "well-founded fear of persecution," Kashani alleged in his application that he would be executed if he returned to Iran because of his activities in the now outlawed Rastakhiz Political Party, including his actions as an investigator for the Headquarters for Fighting Against Profiteering, a division of the party; his outspoken opposition to the Ayatollah Khomeni, the current leader of Iran, and the Ayatollah's National Secret Service; and his work as a journalist. Additionally, Kashani contended that he did not practice a religion or belong to a religious group and that the Iranian government, "is known to

have mass murdered ... those who allegedly do not adequately belong to a religious group."

On October 20, 1983, a year after Kashani filed his Asylum Request, the District Director denied the request because Kashani "failed to establish a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion...." On that same day, the District Director notified Kashani that he was required to depart from the United States, at his own expense, on or before November 20, 1983.

On November 20, 1983, Kashani filed a "Verified Complaint for Judicial Review and Motion for Preliminary Injunction" in the United States District Court for the Southern District of Indiana alleging that the District Director abused her discretion in denying his asylum request and that she failed to consider relevant evidence and based her decision on non-relevant grounds. Kashani asked the district court to enjoin any further deportation proceedings and to grant his request for asylum. The district court dismissed the complaint, holding that "[a]n applicant for asylum does not have the right to appeal the District Director's decision in the district court." Kashani urges us to reverse the district court's determination that it does not have jurisdiction, arguing that since the District Director's denial is not made during a deportation proceeding, the denial does not fall within the Court of Appeal's exclusive jurisdiction over deportation orders and may be reviewed by the district court.

## II.

Section 208 of the Immigration and Nationality Act, (8 U.S.C. § 1158(a)), requires the Attorney General to:

> "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General deter-

mines that such alien is a refugee within the meaning of Section 1101(a)(42)(A) of this title."

The regulations implementing § 208, 8 C.F.R. § 208 *et seq.*, provide two procedures for applying for asylum. If the alien is not the subject of deportation proceedings (*i.e.* an alien seeking admission to the United States or an alien within the United States who has not been served with either a notice of referral to exclusion proceedings or an order to show cause for departure), the alien may file an asylum application with the District Director. 8 C.F.R. § 208.3(a). The District Director must request an advisory opinion from the Bureau of Human Rights and Humanitarian Affairs ("BHRHA") of the Department of State, *id.* at § 208.7, and if the District Director's decision is based in whole or in part on a BHRHA advisory opinion, the BHRHA advisory opinion will be made part of the record of proceedings unless it is classified. *Id.* at § 208.8(d). If the BHRHA advisory opinion is included in the record, the applicant must be given an opportunity "to inspect, explain, and rebut the opinion...." *Id.* Moreover, the applicant must be examined in person by an Immigration officer prior to the adjudication of the asylum application. *Id.* at § 208.6. The applicant for asylum has the burden of proving that he is unable to return to his native country, "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* at § 208.5. Although the regulations specify six situations in which the District Director "shall" deny a request for asylum, *id.* at § 208.9(f), they also provide that "[t]he District Director may approve or deny the asylum application in the exercise of his discretion," *id.* at § 208.8(a), and, "no appeal shall lie from the decision of the District Director." *Id.* at (c). If the application is

denied, the District Director, may in his discretion grant departure [1] or commence deportation proceedings. *Id.* at § 208.-8(f)(4).

If the alien is subject to deportation proceedings, he may file an asylum application with the Immigration court. *Id.* at § 208.-3(b). If the alien had previously filed an application for asylum with the District Director and the application was denied, the alien may renew his request for asylum before the Immigration Judge in the exclusion or deportation proceeding. *Id.* at § 208.9. Thus, the regulatory scheme provides two opportunities to file asylum applications by allowing asylum applications to be presented to the District Director, and, if denied, to be renewed before the Immigration Judge in an ensuing deportation proceeding. *Jean v. Nelson*, 727 F.2d 957, 981 (11th Cir.1984). The Immigration Judge must request a BHRHA advisory opinion unless an advisory opinion was previously issued in an application to the District Director and "circumstances have [not] changed so substantially since the first opinion was provided that a second referral would [not] materially aid in adjudicating the asylum request." *Id.* at § 208.10(b). Unless classified, the BHRHA advisory opinion is made part of the record and the applicant must be given an opportunity to inspect, explain, and rebut it. *Id.* During the hearing, both the applicant and the INS may present additional evidence for the record, *id.* at § 208.10(c), and the applicant carries the burden of proving "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* at § 208.5. Although the regulations do not specify how the Immigration Judge is to make his decision concerning the asylum applicant, the Board of Immigration Appeals has indicated that "it will use the regulations addressed to the District Director as 'useful

---

1. The decision whether to grant voluntary departure is discretionary and may be made either by the District Director or by an Immigration Judge during deportation proceedings. *See* 8 C.F.R. § 244.1 ("if the alien establishes that

he/she is willing and has the immediate means with which to depart promptly from the United States, an immigration judge may authorize the alien to depart voluntarily from the United States in lieu of deportation....")

guidelines' in the exercise of the Board's own discretion over asylum requests." *Carvajal-Munoz v. INS*, 743 F.2d 562, 566 (7th Cir.1984). If the Immigration Judge denies the asylum application, the exclusion or deportation proceedings "shall" be reinstituted. 8 C.F.R. § 208.10(f). The Immigration Judge's denial of an asylum request may be appealed administratively to the Board of Immigration Appeals ("BIA") and, if denied, may be appealed to the Court of Appeals having jurisdiction along with the final order of deportation. *Carvajal-Munoz v. INS*, 743 F.2d 562 (7th Cir. 1984).

Judicial review of orders of deportation and exclusion are governed by 8 U.S.C. § 1105a. The Court of Appeals has exclusive jurisdiction to review "all final orders of deportation ... made against aliens within the United States pursuant to administrative procedures under [8 U.S.C. § 1252(b)]." *Id.* at § 1105a(a). Section 1105a(c) requires aliens to exhaust their administrative remedies before seeking relief in the Court of Appeals:

"An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations or if he has departed from the United States after the issuance of the order. Every petition for review or for habeas corpus shall state whether the validity of the order has been upheld in any prior judicial proceeding, and, if so, the nature and date thereof, and the court in which such proceeding took place. No petition for review or for habeas corpus shall be entertained if the validity of the order has been previously determined in any civil or criminal proceeding, unless the petition presents

grounds which the court finds could not have been presented in such prior proceeding, or the court finds that the remedy provided by such prior proceeding was inadequate or ineffective to test the validity of the order."

8 U.S.C. § 1105a(c). With the exception of orders of deportation and exclusion, district courts have jurisdiction over all causes, civil and criminal, arising under subchapter 2 of the Immigration and Nationality Act. 8 U.S.C. § 1329.

Kashani bases his argument that the district court has jurisdiction to review the merits of the district director's denial of an asylum application and to enjoin deportation proceedings on our decision in *Carvajal-Munoz* and the Eleventh Circuit decisions in *Jean v. Nelson*, 727 F.2d 957 (11th Cir.1984) [2] and *Haitian Refugee Center v. Smith*, 676 F.2d 1023 (5th Cir.1982) ("HRC") [3]. In *Carvajal-Munoz*, our court addressed the issue of whether the Immigration Judge's denial of an asylum application is reviewable in the court of appeals. Relying on *Foti v. INS*, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963) and *Cheng Fan Kwok v. INS*, 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968), we determined that an Immigration Judge's denial of an applicant's request for asylum made during a deportation proceeding was an "integral part" of the deportation proceeding and that review of the Immigration Judge's asylum denial would further 8 U.S.C. § 1105a's goal of "preventing successive dilatory appeals to various federal courts." 743 F.2d at 567. We held that the Immigration Judge's denial of an applicant's request for asylum during a deportation proceeding could be reviewed by the court of appeals when appealed along with the deportation order. In passing, we not-

---

**2.** After the briefs in this case were filed, the Supreme Court held that in *Jean* that the Eleventh Circuit improperly reached the constitutional question of whether the Fifth Amendment applied to consideration of admitted aliens for parole. *Jean v. Nelson*, — U.S. —, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). The Supreme Court's decision does not affect the outcome of this appeal. We discuss the opinion in *Jean*

because Kashani misapplies the holding as supporting his argument that the district court has jurisdiction to review the district director's denial of applications for asylum in individual cases.

**3.** Unit B of the Fifth Circuit became a part of the Eleventh Circuit. *See HRC*, 676 F.2d at 1023n.

ed our approval of the Fifth Circuit's decision in *Fleurinor v. INS*, 585 F.2d 129 (5th Cir.1978), interpreting administrative regulations governing applications for asylum prior to the addition of the asylum provisions to the Act in the Refugee Act of 1980. The Fifth Circuit held that the District Director's denial of an asylum application was not reviewable by the court of appeals because the District Director's decision on the asylum application was not made during a deportation proceeding. 743 F.2d at 566–67. In *Jean* and *HRC*, the Eleventh Circuit addressed the question of whether the district court had jurisdiction to exercise its equitable powers to enjoin political asylum. The Eleventh Circuit concluded that Congress did not intend a "wholesale, carefully orchestrated program" by the INS to deny aliens their statutory and allegedly constitutional rights to petition for asylum [4] and that the existence of this statutorily guaranteed right to apply for asylum bars government officials from adopting policies that conflict with terms of the statute and the applicable regulations. *Jean*, 727 F.2d at 982–983; *HRC*, 676 F.2d at 1033–36. The Eleventh Circuit held that the district court had the authority under its federal question jurisdiction to enjoin a "pattern and practice" of immigration officials designed to violate the aliens' right to petition for asylum. *Jean*, 727 F.2d at 981–83; *HRC*, 676 F.2d at 1032–36.

Kashani's argument is based not only on our holding in *Carvajal-Munoz* that the District Director's denial of an asylum application is not reviewable in the court of appeals because it is not made during a deportation proceeding but also upon the Eleventh Circuit's finding of district court jurisdiction to enjoin the District Director from engaging in a "pattern and practice" of denying aliens their right to petition for asylum. Kashani reasons that since the District Director's denial is not made dur-

ing a deportation proceeding, the district court has jurisdiction to review the merits of the District Director's denial of his asylum petition and to enjoin further deportation proceedings. The INS argues that the district court did not have jurisdiction to enjoin further deportation proceedings or to review the merits of the District Director's denial of Kashani's asylum petition because Congress never intended that district courts would review the merits of the District Director's denial; according to the INS, the alien must initially exhaust his administrative remedies with a renewal of his application for asylum in the ensuing deportation proceeding before attempting judicial review. The INS additionally argues that the political question doctrine precludes judicial review of the merits of the district director's denial.

Initially we address Kashani's argument that *Jean* and *HRC* stand for the proposition that the district courts have jurisdiction to review the merits of the district director's denial of asylum petitions and to enjoin further deportation proceedings. The Eleventh Circuit specifically held that it limited its jurisdictional holding to complaints alleging a "a pattern and practice" by Immigration officials to deny aliens their right to petition for asylum and pointedly refused to allow district court jurisdiction to review the District Director's denial in individual cases:

"[I]nsofar as the first three counts set forth matters alleged to be part of a pattern and practice by Immigration officials to violate the constitutional rights of a class of aliens they constitute wrongs which are independently cognizable in the district court under its federal question jurisdiction. Although a court of appeals may have sole jurisdiction to review alleged procedural irregularities in an individual deportation hearing *to the extent these irregularities may provide a basis for reversing an individual*

---

**4.** The *HRC* panel's holding that excludable aliens have constitutional rights under the Fifth Amendment with regard to their applications for admissions, asylum, or parole within the United States was overruled by the *en banc*

opinion in *Jean*. 727 F.2d at 976 n. 27 and 982 n. 34. The Supreme Court has held that the court improperly reached this constitutional issue. *Jean v. Nelson*, —— U.S. ——, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

*deportation order,* that is not to say that a program, pattern or scheme by Immigration officials to violate the constitutional rights of aliens is not a separate matter subject to examination by a district court and to the entry of at least declaratory and injunctive relief. The distinction we draw is one between the authority of a court of appeals to pass upon the merits of an individual deportation order and any action in the deportation proceeding to the extent it may affect the merits determination, on the one hand, and, on the other, the authority of a district court to wield its equitable powers when a wholesale, carefully orchestrated, program of constitutional violations is alleged.

In concluding that the district court had jurisdiction over the first three counts, we wish to emphasize the factual uniqueness of this case. Our holding is not to be construed as permitting a constitutional challenge in the district court based on a procedural ruling in a deportation proceeding with which an alien is dissatisfied. We refuse to condone any such end-run around the administrative process. Casting as a constitutional violation an interlocutory procedural ruling by an immigration judge will not confer jurisdiction on the district court. Such a result would indeed defeat the congressional purpose behind the enactment of Section 106(a)—the elimination of dilatory tactics by aliens challenging deportation orders in piecemeal fashion. Congress resolved this problem by consolidating jurisdiction over challenges to final orders of deportation in one court, the court of appeals. We do not intend by our holding today to emasculate that solution, and given the narrowness of our holding, we do not expect such a result."

*HRC,* 676 F.2d at 1033 (emphasis in original) (footnotes omitted); *see also, Jean,* 727 F.2d at 980. Thus, as the Eleventh Circuit made explicit, *HRC* and *Jean* merely stand for the proposition that an agency's wholesale, carefully orchestrated program to deny statutorily guaranteed rights consti-

tutes a wrong that is "independently cognizable in the district court under its federal question jurisdiction." *Jean,* 727 F.2d 980. *Jean* and *HRC* do not stand for the proposition that district courts have jurisdiction to review the merits of the denial in an *individual* case that does not allege a pattern and practice of immigration officials to deny statutorily-guaranteed rights.

We now turn to the INS' argument that Congress intended that aliens exhaust their administrative remedies by renewing their petitions for asylum in deportation proceedings, rather than seeking judicial review of the merits of the District Director's denial and injunctive relief in the district court. Kashani directs our attention to the presumption of reviewability embodied in the Administrative Procedure Act: any person "adversely affected or aggrieved" by agency action is entitled to "judicial review thereof," as long as the action is a "final agency action for which there is no other adequate remedy in the act." 5 U.S.C. §§ 702, 704. The INS, on the other hand, urges us to rely on an exception to the presumption of reviewability, arguing that judicial review is not available when "statutes preclude judicial review." *Id.* at § 701(a)(1). The procedure for determining whether a statute precludes judicial review recently was explained by the Supreme Court:

> "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.
>
> \*     \*     \*     \*     \*     \*
>
> The presumption favoring judicial review of administrative action is just that—a presumption. This presumption, like all presumptions used in interpreting statutes, may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent. The congressional intent necessary to overcome the presumption may also be inferred from contemporaneous

judicial construction barring review and the congressional acquiescence in it, or from the collective import of legislative and judicial history behind a particular statute. [T]he presumption favoring judicial review of administrative action may be overcome by inferences of intent drawn from the statutory scheme as a whole.

\* \* \* \* \* \*

[T]he court has found the [clear and convincing evidence] standard met, and the presumption favoring judicial review overcome, whenever the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.' In the context of preclusion analysis, the 'clear and convincing evidence' standard is not a rigid evidentiary task but a useful reminder to courts that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling."

*Block v. Community Nutrition Institute*, 467 U.S. 340, 104 S.Ct. 2450, 2454, 2456, 2457, 81 L.Ed.2d 270 (1984) (citations omitted). Thus, we must examine the judicial review and asylum provisions of the Immigration and Nationality Act to determine whether Congress intended to preclude judicial review of the District Director's denial of an individual alien's asylum petition.

An examination of the Act reveals that it is silent on the question of whether the merits of the district director's denial of an alien's asylum application may be reviewed in the district court. Accordingly, we turn to the legislative histories of the judicial review provision and the provision for asylum. Section 1105a, granting the court of appeals exclusive jurisdiction over orders of deportation and exclusion, was enacted "to frustrate certain practices which had come to the attention of Congress, whereby persons subject to deportation were forestalling departure by dilatory tactics in the courts." *Foti v. INS*, 375 U.S. 217, 224, 84 S.Ct. 306, 311, 11 L.Ed.2d 281 (1963).

"Other aliens, mostly subversives, gangsters, immoral [persons], or narcotic peddlers, manage to protract their stay here indefinitely only because their ill-gotten gains permit them to procure the services of astute attorneys who know how to skillfully exploit the judicial process. Without any reflection upon the courts, it is undoubtedly now the fact that such tactics can prevent enforcement of the deportation provisions of the Immigration and Nationality Act by repetitive appeals to the busy and overworked courts with frivolous claims of impropriety in the deportation proceedings."

*Foti*, 375 U.S. at 225, 84 S.Ct. at 311. Of particular concern was litigation arising out of discretionary determinations by the INS. *Id.* at 226, 84 S.Ct. at 312. To eliminate delay and the opportunity for employing dilatory tactics, Congress eliminated district court review of deportation and exclusion orders and granted exclusive jurisdiction to the court of appeals, subject to the certiorari jurisdiction of the Supreme Court, "to create a single, separate, statutory form of judicial review of administrative orders for the deportation of aliens." *Id.* at 225, 84 S.Ct. at 312. Subsequent Supreme Court decisions construing § 1105a held that Congress restricted the application of § 1105a to "orders entered during proceedings conducted under § 242(b) [8 U.S.C. § 1252(b) (deportation proceedings)] or directly challenging deportation orders themselves." *Cheng Fan Kwok v. INS*, 392 U.S. 206, 215, 88 S.Ct. 1970, 1975, 20 L.Ed.2d 1037 (1968); *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 2777, 77 L.Ed.2d 317 (1983). The term "final orders" under § 1105a "includes all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing." *Chadha*, 103 S.Ct. at 2777.

The INS argues, and we agree, that allowing district court review of the District Director's denial of applications for asylum and the granting of an injunction of further deportation proceedings would delay deportation proceedings and, contrary to Congressional intent would allow the sort of dilatory tactic that Congress sought to con-

trol and suppress when it enacted § 1105a. The precise question of congressional intent we must answer, therefore, is whether Congress intended to abandon the § 1105a goal of expediting deportation proceedings and consolidating review in the court of appeals when it ordered the attorney general to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum...." 8 U.S.C. § 1158(a). The asylum provision was added by the Refugee Act of 1980 ("Refugee Act"), Pub.L. 96–212, 94 Stat. 102. "The principal motivation for the enactment of the Refugee Act of 1980 was a desire to revise and regularize the procedures governing the admission of refugees into the United States [and] to eliminate the piecemeal approach to *admission* of refugees previously existing under § 203(a)(7) and § 212(d)(5) of the Immigration and Nationality Act, and § 108 of the regulations, and to establish a systematic scheme for admission and resettlement of refugees." *INS v. Stevic*, 467 U.S. 407, 104 S.Ct. 2489, 2498–99, 81 L.Ed.2d 321 (1984) (emphasis in original). Of particular concern to Congress was the Attorney General's use of his parole authority to admit refugees on an ad hoc basis. S.Rep.No. 256, 96th Cong., 2d Sess., 1, 2, 5, 17 (1980) (hereinafter S.Rep.), *reprinted in* 1980 U.S.Code Cong. & Adm.News 141, 142, 145, 157. Moreover, no specific statutory basis for asylum applications by aliens within the United States existed. *Stevic*, 104 S.Ct. at 2499 n. 20; *Carvajal-Munoz*, 743 F.2d at 564 n. 3. The Attorney General utilized his power to administer and enforce laws relating to immigration, 8 U.S.C. § 1103, to promulgate regulations allowing aliens to apply for asylum with the INS District Director. *Stevic*, 104 S.Ct. at 2499 n. 20; *Carvajal-Munoz*, 743 F.2d at 564 n. 3. The District Director could approve or deny the asylum application in the exercise of his discretion and the District Director's decision could not be administratively appealed. *Carvajal-Munoz*, 743 F.2d at 564 n. 3. In 1979, the regulations were amended to give Immigration Judges and the Bureau of Im-

migration Appeals authority to consider applications for asylum made after the commencement or completion of deportation proceedings. *Stevic*, 104 S.Ct. at 2499 n. 20; *Carvajal-Munoz*, 743 F.2d at 564 n. 3. The Refugee Act provided the statutory authority for asylum applications by aliens within the United States and required "[t]he attorney general to establish a uniform procedure for passing upon an asylum application. The uniform procedure should include a provision allowing all asylum applicants an opportunity to have their claims considered outside a deportation and/or exclusion proceeding, provided the order to show cause has not been issued." S.Rep. at 16, 1980 U.S.C.C.A.N. at 156.

Thus, our review of the legislative history of the Refugee Act reveals that Congress intended to establish a systematic scheme for admitting refugees but failed to reveal any evidence of congressional intent to allow review of the District Director's denial of an asylum petition. Moreover, the regulatory scheme in effect at the time the Refugee Act was enacted, which was substantially the same as the present scheme, *see Stevic*, 104 S.Ct. at 2499 n. 20, and *Carvajal-Munoz*, 743 F.2d at 564 n. 3, furthered the § 1105 a goal of expediting deportation proceedings and consolidating judicial review in the court of appeals. Section 1105a(c) provides that, "[a]n order of deportation or exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies to him as a right under the Immigration laws and regulations." As the Supreme Court has noted, the requirement that administrative remedies must be exhausted before seeking judicial relief, like the requirement of finality, promotes both administrative and judicial efficiency:

"A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which

decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise. And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages. The very same reasons lie behind judicial rules sharply limiting interlocutory appeals. Closely related to the above reasons is a notion peculiar to administrative law. The administrative agency is created as a separate entity and invested with certain powers and duties. The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction. As Professor Jaffe puts it, '[t]he exhaustion doctrine is, therefore, an expression of executive and administrative autonomy.' This reason is particularly pertinent where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise. * * [J]udicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or apply its expertise. In addition, other justifications for requiring exhaustion in cases of this sort have nothing to do with the dangers of interruption of the administrative process. Certain very practical notions of judicial efficiency come into play as well. A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene. And notions of administrative autonomy require that the agency be given a chance to discover and correct its own errors. Finally, it is possible that the frequent and deliberate flounting of administrative process could weaken the effectiveness

of an agency by encouraging people to ignore its procedures."

*McKart v. United States*, 395 U.S. 185, 194–95, 89 S.Ct. 1657, 1662–65, 23 L.Ed.2d 194 (1969) (citation omitted). To determine whether requiring aliens to exhaust their administrative remedies would promote judicial and administrative efficiency, we turn to the regulations and compare the application procedure before the district director with the procedure before the Immigration Judge. Initially, we note that a more complete record is made in the proceeding before the Immigration Judge. Unlike the procedure before the Immigration Judge, the record developed before the District Director does not contain the BHRHA advisory opinion unless the District Director bases his decision in whole or in part on the advisory opinion and the alien does not have the right to challenge the advisory opinion unless it is part of the record. 8 C.F.R. § 208.8(d). In the proceeding before the Immigration Judge, on the other hand, the BHRHA advisory opinion is automatically included in the record unless it is confidential and the alien has the right to "inspect, explain and rebut it." *Id.* at § 208.10(b). Moreover, the alien is given an opportunity to present additional evidence for the record. *Id.* at 208.10(c). It is clear to us from this comparison of the two procedures that the proceeding before the Immigration Judge develops the more extensive factual record for our review. Moreover, because the Immigration Judge's decision may be appealed to the Bureau of Immigration Appeals, the agency is afforded "a chance to discover and correct its own errors." *McKart*, 395 U.S. at 195, 89 S.Ct. at 1663. Thus, we hold that the goals of judicial and administrative efficiency are promoted in requiring an alien seeking asylum to exhaust his administrative remedies before seeking judicial relief.

In light of the overall statutory scheme, the judicial interpretation of the Act, and Congress' failure explicitly to provide for district court jurisdiction to review the District Director's denials of petitions for asylum and to enjoin further deportation pro-

ceedings, we hold that aliens may not seek district court review of the District Director's denial of their asylum petitions and injunction of deportation proceedings but must exhaust their administrative remedies by renewing the asylum petition in the ensuing deportation proceeding.

Indeed, we hasten to note that our holding is also supported by the political question ground urged on us by the INS. The political question doctrine, one of the principles of justiciability governing the jurisdiction of the federal courts, is based upon the separation of federal powers and will be invoked when any one of the following circumstances is present:

"a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

The power to control the admission of foreigners is an inherent attribute of national sovereignty and the Supreme Court has long recognized that the political branches of the federal government possess concurrent authority to establish and implement substantive and procedural rules governing the admission of aliens to this country.[5] *Fong Yue Ting v. United States*, 149 U.S. 698, 707–11, 13 S.Ct. 1016, 1019–21, 37 L.Ed. 905 (1893); *Nishimura Ekiu v. United States*, 142 U.S. 651, 654, 659, 12 S.Ct. 336, 337, 338, 35 L.Ed. 1146

(1892); *Chae Chan Ping v. United States [The Chinese Exclusion Case]*, 130 U.S. 581, 609, 9 S.Ct. 623, 631, 32 L.Ed. 1068 (1889). Indeed, "[a]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations." *The Chinese Exclusion Case*, 130 U.S. at 606, 9 S.Ct. at 630. The Supreme Court has repeatedly held that "[t]he power over aliens is of a political character and therefore subject only to narrow judicial review," *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 n. 21, 96 S.Ct. 1895, 1904 n. 21, 48 L.Ed.2d 495 (1976); *Mathews v. Diaz*, 426 U.S. 67, 82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976) (narrow standard of judicial review applies to decisions "made by the Congress or the President in the area of immigration"), and are "largely immune from judicial control." *Shaughnessy v. United States, ex rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952) (immigration matters are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference").

An examination of the legislative history of the Refugee Act reveals that Congress wished to replace the ad hoc use of the parole authority, which was used to admit refugees, with more formal procedures so that it might expand Congress' role in the admission process and to provide for planning for the impact of refugees on local communities. S.Rep. at 5–13, 1980 U.S.C.C.A.N. at 145–53. The President was required to consult with Congress to establish "normal flow numbers" of refugees. S.Rep. at 5–8, 1980 U.S.C.C.A.N. at 145–58. Persons granted asylum are placed in a conditional admission status and are eligible for adjustment of status to lawful permanent resident after being physically present in the United States for at least one year after being granted asylum. 8

---

**5.** The Congressional authority over immigration has largely been delegated to the Attorney General, the member of the Executive branch with principal responsibility for immigration matters. 8 U.S.C. § 1103(a).

U.S.C. § 1159(b). The Act allows the use of up to 5,000 of the "normal flow numbers" for the adjustment of the status of an alien granted asylum to that of lawful permanent resident. *Id.* Congress limited the numbers of refugees admitted yearly because of the impact of the refugees on the social welfare system: qualified refugees are eligible for cash assistance under a modified Aid to Families with Dependent Children Program; Medicaid; "day care, hygiene, family planning, cultural counseling, home management, transportation, housing improvement, ethnic skills, protective service for adults, life skills, vocation services and training, English as a second language training, job referral, nutrition, driver's education." S.Rep. at 11, 1980 U.S.C.C.A.N. at 151. Moreover, the right to petition the Director expires when the District Director initiates deportation proceedings by issuing an "order to show cause." *See* 8 C.F.R. § 208.3(a). Thus, because the right to petition the District Director "expire[s] within a definite time limit," we agree with the Eleventh Circuit's determination that Congress regarded the right to petition the District Director as "a desirable but by no means essential part of the asylum process." *Jean,* 727 F.2d at 982. In effect, because the alien's right to petition for asylum may be exercised both before and during a deportation proceeding, the provision for petitioning the District Director merely affords the INS the opportunity to grant an asylum request without invoking deportation proceedings. In sum, the District Director's decision whether to grant an asylum request involves considerations of foreign and domestic policy and administrative efficiency and is clearly committed to the political branches of the government.

The decision of the district court is AFFIRMED.

RIPPLE, Circuit Judge, concurring.

This case presents a very difficult issue of statutory interpretation. The court's opinion is a thorough and balanced examination of the question which correctly represents, on the basis of all available evidence, the intent of Congress. I write separately only because I have substantial reservations about the court's alternate treatment of the issue under the political question doctrine, a discussion which is unnecessary to the court's basic statutory analysis.

In my view, this litigation does not present an appropriate opportunity to declare definitively that the matter of asylum is "committed to the political branches of government." The full implications of such a statement are difficult to ascertain on this record. It is sufficient to say that the matter of political asylum, closely tied to the conduct of this country's foreign relations, is an area where the political branches have traditionally exercised great discretion and where we would expect Congress to be quite explicit if it intended that the judiciary play a role.