In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2442

BOGUSLAW FORNALIK,

Petitioner-Appellant,

v.

BRIAN PERRYMAN, DISTRICT DIRECTOR OF THE
IMMIGRATION AND NATURALIZATION SERVICE,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99-CV-2167--Suzanne B. Conlon, Judge.

Argued December 6, 1999--Decided August 8, 2000

Before Bauer, Diane P. Wood, and Evans, Circuit Judges.

Diane P. Wood, Circuit Judge.  Boguslaw Fornalik is a seventeen year old whom the Immigration and Naturalization Service (INS) is trying to deport to Poland even though his mother, father, and three brothers are all living in the United States. (Because other members of his family also play important parts in this case, we refer to each individual by his first name.) After proceeding through various INS administrative channels, he filed this habeas corpus action, alleging that he is entitled to immediate permanent resident status by virtue of his father's permanent residency. Meanwhile, he also filed a petition to proceed as an abused child of a lawful permanent resident, a status created by Congress as part of the Violence Against Women Act of 1994 (VAWA), 42 U.S.C. sec. 13981 et seq. (1994). The district court dismissed Boguslaw's habeas petition after the INS had independently determined that he had established a prima facie case under the VAWA, but before it had rendered a final decision.

Between the district court's disposition and our consideration of the case, the Vermont Service Center of the INS notified Boguslaw that it had placed his case in deferred action status for at least fifteen months. At roughly the same time, the Chicago office of the INS told this court

that it intends to remove him anyway. No Act of Congress requires us to permit this type of inconsistent treatment and we will not. We therefore reverse the judgment of the district court and remand with instructions to enforce the order from the Vermont Service Center that places Boguslaw in deferred status.

I
A.

Boguslaw's story begins with his father, Ryszard Fornalik, who participated in the 1995 "Diversity Immigrant" visa lottery established under 8 U.S.C. sec. 1153(c). This program established 55,000 immigrant visa numbers that are allocable to citizens of countries that, in recent years, have not been well represented in the flow of immigrants to the United States. Citizens of eligible countries apply and their applications are chosen at random. In 1995, Poland was an eligible country. Ryszard took advantage of that fact, entered the United States, and was successful in the visa lottery. On August 22, 1995, Ryszard's status was adjusted to lawful permanent resident. At this point, Ryszard's wife, Helena, and sons, Boguslaw and Kryzsztof, anticipated that they, too, would come to the United States as permanent residents. The three were coming not merely to join Ryszard in the United States, but also to obtain better medical care for Kryzsztof, who suffers from Epidermolysis Bullosa, a rare genetic skin disorder that requires continuous medication. In September 1996, all three arrived in the United States on tourist visas. Thinking that he was going to stay here, Boguslaw (then 13) enrolled in a local school and, from all indications, began living the life of a typical American teenager.

Ordinarily, when a family intends to immigrate to the United States, the most difficult hurdle has been surmounted once one member becomes a permanent resident (or, better still, a United States citizen). This is because of a general principle in United States immigration law that sets family unity as one of the principal goals of the statutory and regulatory apparatus. In fact, the original title of the Immigration Act of 1990 was the "Family Unity and Employment Opportunity Immigration Act of 1990." See H.R. Rep. 101-723(II) (1990), reprinted in 1990 U.S.C.C.A.N. 6779. The Immigration and Naturalization Act (INA) itself provides that "[a] spouse or child . . . shall be entitled to the same status, and the same order of consideration provided in the respective subsection, if accompanying or following to join, the spouse or parent." 8 U.S.C. sec. 1153(d).

Sometimes, however, the complexities of the immigration laws overwhelm this basic principle.

That is what happened here. The specific problem lay in the rapid expiration of visa numbers reserved through the Diversity Visa program. Under 8 U.S.C. sec. 1154(a)(1)(G)(ii)(II), these visas expire at the end of the fiscal year in which they are issued (September 30). Ryszard's adjustment of status was finalized on August 22, which meant that he and his family had only a little more than a month to arrange their affairs. Apparently, for reasons that are unclear, Ryszard did not place any requests with the INS to proceed with his family's cases at that time. Boguslaw alleges that Ryszard appeared personally at the American Consulate in Warsaw at some point within four months of his adjustment (but not before September 30), but the record does not reveal what he tried to do when he was there. In any event, when the family came to the United States in 1996, they did not have the immigrant visas to which they would have been entitled as derivative beneficiaries of a successful diversity applicant.

Ordinarily, the fact that Boguslaw did not get a visa number by September 30, 1995, would be the end of the story. The INS points out repeatedly that diversity visa numbers are valid only through the end of the fiscal year in which they are issued. But once again, the rules have their exception. As a result of various administrative problems in Poland's 1995 diversity visa program, Congress carved out a special exception that applies only to diversity visas, only to Poland, and only to the 1995 program, which is found in sec. 637 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009-546. That section commands the Attorney General to grant a diversity visa, without regard to any numerical or priority limitations, to any Polish applicant who:

(1) was selected as a diversity immigrant under such section for fiscal year 1995;

(2) applied for adjustment of status to that of an alien lawfully admitted for permanent residence pursuant to section 245 of such Act during fiscal year 1995, and whose application, and any associated fees, were accepted by the Attorney General, in accordance with applicable regulations;

(3) was not determined by the Attorney General to be excludable under section 212 of such Act or ineligible under section 203(c)(2) of such Act; and

(4) did not become an alien lawfully admitted for permanent residence during fiscal year 1995.

IIRIRA sec. 637(a).

Boguslaw applied for an adjustment of status to permanent resident alien under this statutory provision. The INS district director denied his request, reasoning that sec. 637 does not apply to Boguslaw's case because he did not meet the requirements of sec. 637(a)(2)--specifically, the requirement of an application for adjustment of status some time during fiscal year 1995.

In October 1997, Boguslaw, along with his mother and brothers, received notices to appear before an immigration judge. However, as a result of a variety of INS administrative errors and his mother's change of address, the timetable for removing his mother and brothers has become quite different from his own, meaning that the Chicago office of the INS intends to send Boguslaw back to Poland by himself. The INS is unconcerned about this, indicating at oral argument that Boguslaw can receive care from his nonagenarian grandmother (about whose physical, mental, and financial condition there is nothing in the record) and that its interpretation of the statutes and regulations relating to his case permits this deportation. Surprisingly, the INS could not articulate an agency policy regarding at what age an unaccompanied child would not be deported alone to a country in which he has not lived for nearly four years, but the subsequent course of this case allows that question to be left for another day.
B.

Facing return to Poland alone, Boguslaw took two steps that affect the present appeal. First, on March 26, 1999, he filed a petition under Form I-360, which is entitled "Petition for Amerasian, Widow, or Special Immigrant." That petition, as required by law, was submitted to the INS Vermont Service Center, which processes all such forms. Second, on April 1, 1999, he filed his habeas corpus petition in the United States District Court for the Northern District of Illinois. The habeas corpus petition, which we discuss first, was based on the theory that Boguslaw is entitled to an immediate adjustment of status, while the Form I-360 procedure was based on his unfortunate condition as an abused child of a visa recipient.

In the habeas corpus action, Boguslaw argued principally that the INS itself is at fault for his irregular status. In his view, it had a duty to notify the American Consulate in Warsaw of Ryszard's success in the diversity lottery and subsequent adjustment of status. By failing to do

so, it undermined what would otherwise be Boguslaw's clear entitlement to permanent residency in the United States as a derivative beneficiary of his father. He points to a 1995 State Department Cable that discusses procedures for processing "following to join" applicants. That cable says that "[u]nder current procedures, INS notifies both NVC [the National Visa Center] and posts of the adjustment of status of a principal applicant." The INS counters that it has no duty to inform derivative beneficiaries of a principal immigrant's adjustment of status and that it notifies consular posts only after being prompted to do so. Finding no specific statutory or regulatory command that imposes a duty of notification, we accept for present purposes the INS's position that it did not have a duty to notify the American Consulate of Ryszard's adjustment without any action on the family's part (though we make no ruling on the point).

A closer examination of the complex statutes involved here, however, shows that the underlying merits do not turn solely on Boguslaw's failure to pursue a visa in 1995. Rather, it appears that the entire fiasco was the result of Ryszard's failure to file Form I-824, entitled "Application for Action on an Approved Application or Petition," which would have instructed the Service to inform the American Consulate in Warsaw that his adjustment of status application had been approved. Had this happened, then Boguslaw would be right--the INS would have had a duty to notify the Consulate, which would in turn have sent him "Packet Three," the State Department's shorthand for the initial materials containing an application for an immigrant visa. See Procedural Note 5 to Foreign Affairs Manual sec. 42.33, reprinted in Gordon, et al., Immigration Law and Procedure sec. 992.12 (Rev'd Ed. 1999); Operations Instructions of the Immigration and Naturalization Service sec. 245.7(a) (describing procedures for forwarding principal alien's adjustment of status form to consular posts). So, the failure in this case is attributable not to Boguslaw, who was a boy of twelve years at the end of fiscal year 1995, but rather to his father.

This course of events illustrates an unfortunately common problem with the family-based immigration regime. Derivative beneficiaries are just that--derivative--meaning that they have few rights of their own and instead depend on the competence and cooperation of the principal immigrant. That led Congress to authorize the alternative route Boguslaw took in his Vermont application. Recognizing that ordinarily aligned family interests may become skewed when the principal alien misuses his power

over the immigration status of the derivative beneficiaries, Congress included a section in the VAWA that allows abused spouses and children to petition the INS themselves. 8 U.S.C. sec. 1154(a)(1)(B). (We note that the Supreme Court's recent decision in United States v. Morrison, 120 S. Ct. 1740 (2000), holding unconstitutional another section of the VAWA, 42 U.S.C. sec. 13981, was limited to that particular section of the statute and did not suggest that it was striking down the entire law. See id. at 1748. The section before us now, 8 U.S.C. sec. 1154(a)(1)(B), rests on Congress's plenary power over immigration. See, e.g., Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 201 (1993); Kleindienst v. Mandel, 408 U.S. 753, 766 (1972). Nothing in Morrison casts doubt on its constitutionality.) To apply for protection under this provision, a spouse or child files Form I-360, entitled "Petition for Amerasian, Widow, or Special Immigrant." INS approval of this petition allows a formerly dependent potential immigrant to file on her or his own behalf, thereby avoiding the problems created by the usual dependence on the principal alien.

The question that eventually must be resolved in Boguslaw's case is how to reconcile these two statutory regimes--the application requirement of IIRIRA sec. 637 and the VAWA exception for abused dependents. No one in this case has yet explored whether an INS finding of abuse affects the proper interpretation of the application requirement of IIRIRA sec. 637, but it was such a finding that prompted the action of the Vermont Service Center. Boguslaw details in his brief the sad deterioration of his family situation. Arguments degenerated into physical fights, and Boguslaw himself was the target of physical abuse from his father. His mother left the household and obtained a court order of protection against Ryszard. This issue is not properly before us at present, but it may be cognizable at some point if Boguslaw is frustrated again in his effort to correct his father's omissions and then takes an appeal to this court.

The habeas corpus proceedings and the Form I-360 proceedings have been moving along in tandem. The district court dismissed the habeas corpus case, reasoning that under sec. 242(g) of the IIRIRA, codified at 8 U.S.C. sec. 1252(g), it did not have subject matter jurisdiction over Boguslaw's case. In so ruling, it construed Boguslaw's claim as one that arose from a decision of the Attorney General to "commence removal proceedings" against him. It further concluded that, even if subject matter jurisdiction were present, Boguslaw did not state a claim because he failed to apply for a visa in

1995, taking his case out of those covered by sec. 637 of the IIRIRA. After the district court's dismissal but before our consideration of this appeal, the Vermont Service Center rendered its final decision on Boguslaw's I-360 petition. It granted his request, indicating that he now should either petition for adjustment of status (if in the United States) or request further action (if outside). More importantly, the INS also included a "Notice of Deferred Action," which informed Boguslaw that:

In the exercise of its prosecutorial discretion, the Service has decided to place this case under deferred action. Deferred action is an administrative choice to give some cases lower priority for removal. The Service does not anticipate instituting action for removal in this case at this time.

. . .

Deferred action will remain in effect for a period of fifteen (15) months from the date of this notice [August 16, 1999], unless terminated earlier by the Service for reasonable cause and upon appropriate notice.

The INS did not address this action in its brief to this court, nor did it consider the notice relevant when we inquired about it during oral argument. Since we heard arguments in this case, the INS granted a similar petition for Boguslaw's mother, though it appears she is still on a different timetable than her son.

II
A.

The essential problem in this case comes from the interaction (or lack thereof) between the INS's August 16 decision to place Boguslaw in deferred action status after granting his petition to proceed as a self-petitioning child of an abusive lawful permanent resident and the decision of the Chicago office that prompted his case. Despite having nearly a month to think about the proper way to reconcile these two outstanding orders (since the Vermont Service Center rendered its final decision on August 16 and the INS's brief to this court was due on September 14), the INS offered no additional help in its brief.

At oral argument, the INS finally addressed the issue, repeatedly maintaining that it is not proper for us to consider its most recent action, consisting of the notice sent to Boguslaw informing him that "[i]n the exercise of its prosecutorial discretion, the Service has decided

to place this case under deferred action." This is a very strange claim, especially because the preliminary determination by the INS notifying Boguslaw that he had established a prima facie case under the self-petitioning provisions of the VAWA was included in the record on appeal. In any event, this court and at least one other Court of Appeals have specifically held that we may take judicial notice of official INS actions. Opoka v. INS, 94 F.3d 392, 394-95 (7th Cir. 1996) (taking judicial notice of a motion to reopen BIA proceedings); Lising v. INS, 124 F.3d 996, 998 (9th Cir. 1997) (holding that court may take judicial notice of official INS forms). More generally, it is well-established that executive and agency determinations are subject to judicial notice. See Waid v. Merrill Area Public Schools, 130 F.3d 1268, 1272 (7th Cir. 1997) (discussing court's discretion to take judicial notice of agency factfinding); United States v. Eagleboy, 200 F.3d 1137, 1140 (8th Cir. 1999) (allowing United States to introduce administrative document on appeal); Don Lee Distributor, Inc. v. NLRB, 145 F.3d 834, 841 (6th Cir. 1998) (noting authority of courts to take judicial notice of agency and judicial decisions).

Determining the effect of the order is a more difficult task. Ordinarily, deferred action "recognizes that the Service has limited enforcement resources and that every attempt should be made administratively to use these resources in a manner which will achieve the greatest impact under the immigration laws." 62 Fed. Reg. 63249, 63253 (November 28, 1997). Given the strange circumstances of this case, we can certainly understand why the Vermont Service Center found little point in aggressively pursuing the removal of a (then) sixteen year old. However, given counsel's assertion at oral argument that the Chicago office had no intention of respecting the Vermont determination, the consequences of the deferral order are not crystal clear.

At oral argument, the INS offered no help, simply stating that a notice of deferred action issued by the Vermont Service Center in St. Albans, Vermont, could not trump the decision of the district director in Chicago. We are baffled by this position--the last we checked, the INS is one unified agency of the federal government, not a mare's nest of competing and autonomous actors. Furthermore, there is no indication in the regulations that a district office carries greater authority than a service center. To the contrary, the regulations equate district and service center directors, 8 C.F.R. sec. 1.1(o). Their delegated functions are also similar and neither office trumps the other except where

regulations explicitly so provide. Compare 8 C.F.R. sec. 103.1(f)(3)(v) (Service Centers) with 8 C.F.R. sec. 103.1(g)(2)(ii) (Districts).

Most importantly, the INS is the INS, and the Vermont Service Center had specific notice from Boguslaw that he was already under an order of removal. Both his letter accompanying the Form I-360 and the I-360 itself indicated this fact. Faced with this petition, the INS (using its official form for notices of action, Form I-797) decided to place him in deferred action status and to invite him to apply for an adjustment of status or an immigrant visa. It further indicated that it is not planning to pursue removal for at least 15 months. Nothing in his notice, which is entitled "Notice of Action" and bears the heading "U.S. Department of Justice Immigration and Naturalization Service," suggests that it is not the decision of the INS or that it was made without authority. Moreover, the regulatory section defining the authority of the service center director does not appear to preclude such an action.

Finding the INS's claim that we should simply ignore the August 16, 1999, order because "that is from Vermont and this is Chicago" unconvincing, we are inclined to follow a simple decision principle--the last agency action supplants all prior ones. Where (as in this case), the last office to act has full knowledge of the actions taken by other branches of the same agency, it cannot simply issue a decision and expect its pronouncement to have no effect. The Chicago office of the INS may be unhappy with this result, but it had ample notice of this problem and could have communicated its concerns to the Vermont Service Center. The real question is who should bear the burden of a problem created because (as the INS conceded at oral argument) the two branches were not talking to one another; without a much more convincing argument than the one that the INS presented, we decline to place that burden on Boguslaw.

Perhaps there are alternative ways of reconciling the competing decisions of various INS offices, but the INS did not offer a satisfactory one, despite the fact that more than seven months had passed since counsel for the INS in this case received service of Boguslaw's motion containing the Vermont Service Center's prima facie determination. As a result, the INS's decision to place Boguslaw in deferred action "for a period of fifteen (15) months from [August 16, 1999], unless terminated earlier by the Service for reasonable cause and upon appropriate notice" must therefore be the baseline from which all subsequent actions in this case (whether

taken by the INS or Boguslaw) shall begin.

B.

The only conceivable fly in this ointment comes from 8 U.S.C. sec. 1252(g), the statute on which the district court relied, which forecloses challenges to certain decisions and actions of the Attorney General. This is the principal argument the INS has made in its effort to defend the Chicago District Director's decision. The statute, which was adopted by Congress as part of the IIRIRA's general curtailing of judicial review in immigration cases, reads: "Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

Perhaps this language could have been construed as the INS urges, to preclude jurisdiction merely because Boguslaw is raising a grievance around the same time that the INS is planning to execute a removal order. The Supreme Court, however, has instructed otherwise. In Reno v. American-Arab Anti-Discrimination Committee (AADC), 525 U.S. 471 (1999), the Court held that sec. 1252(g) restricts the district courts' power only in the three circumstances discussed in the text: when the alien challenges discretionary actions taken by the Attorney General to (1) commence proceedings, (2) adjudicate cases, and (3) execute removal orders. AADC, 525 U.S. at 482. See also Bhatt v. Reno, 204 F.3d 744, 747 (7th Cir. 2000).

This court has held that sec. 1252(g) precludes jurisdiction even in habeas cases such as this one, but (perhaps obviously) only where the statute is applicable--i.e. the three areas that the Supreme Court noted in AADC. See Singh v. Reno, 182 F.3d 504, 508-09 (7th Cir. 1999) (holding sec. 1252(g) applicable to habeas claim that challenged INS deportation decision). This case does not fall into any of those categories. Certainly Boguslaw has filed his habeas petition because he does not want to go back to Poland, but that cannot be a sufficient basis for invoking sec. 1252(g). The INS's suggested reading would render AADC entirely meaningless, since almost every alien who brings a claim to federal court--whether on appeal from the Board of Immigration Appeals (BIA), through a habeas petition, or via some other route--does so because she is threatened with removal from the United States. This interpretation might lead to tension with our earlier decision in Kashani v.

Nelson, 793 F.2d 818 (7th Cir. 1986), in which we dismissed for failure to exhaust administrative remedies a case brought by an alien challenging the district director's denial of asylum, reasoning that the alien could raise the same claim again in removal proceedings. Nothing in AADC undermines Kashani; to the contrary, AADC supports the importance of proper use of the administrative process. As the INS would have it here, the alien not only would be barred from raising virtually all claims prior to removal proceedings (because of exhaustion requirements), but then sec. 1252(g) would preclude jurisdiction of all claims brought after removal is threatened. Such a sweeping reading would be inconsistent with the narrow interpretation of sec. 1252(g) that AADC commands. AADC, 525 U.S. at 487.

AADC holds that sec. 1252(g) precludes the district courts from acting when the decision about which the alien is complaining is one of the three listed in the statute: commencing proceedings, adjudicating a case, or executing a removal order. Although sec. 1252(g) is relatively new, it uses language and a structure that is very familiar in the jurisdictional context. Section 1252(g) refers to a "cause or claim . . . arising from the decision or action of the Attorney General." This is remarkably similar to 28 U.S.C. sec. 1331, which gives the district courts jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." Federal question jurisdiction does not rest merely on some obscure relationship between the cause of action and a federal law. Rather, courts look to whether a federal question is presented in a "well-pleaded complaint." Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987); Shegog v. Board of Education of the City of Chicago, 194 F.3d 836, 838 (7th Cir. 1999); Davis v. Rodriguez, 106 F.3d 206, 208 (7th Cir. 1997). Similarly, sec. 1252(g) is applicable only where the alien's well-pleaded complaint is based on one of sec. 1252(g)'s three listed factors. This analysis comports not only with our general understanding of federal jurisdictional statutes, but also with AADC itself, which reached its conclusion about the limited scope of sec. 1252(g) by referring generally to other statutory provisions addressing federal courts' power. AADC, 525 U.S. at 482.

Here, Boguslaw's claim that he is entitled to an adjustment of status to lawful permanent resident has little to do with a "decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders." He asserts instead that the district

director's denial of his December 1996 adjustment of status application was incorrect as a matter of law. Since the INS did not issue a Notice to Appear (the initial filing in a removal case) until more than ten months later, on October 14, 1997, it is hard to see how we should construe his complaint as one that requests relief from a decision to commence proceedings. Similarly, although Boguslaw obviously wants this court to stop the execution of a removal order, that fact comes into the case only incidentally. His claim is not that the Attorney General is unfairly executing a removal order, but rather that a prior, unrelated error makes his removal improper. This makes our case entirely different from other decisions of this circuit that have applied AADC. See, e.g., Fedorca v. Perryman, 197 F.3d 236 (7th Cir. 1999) (challenge to a decision to execute a removal order), Botezatu v. INS, 195 F.3d 311 (7th Cir. 1999) (challenge to a refusal to grant humanitarian parole instead of enforcing removal order). We therefore reject the INS's argument that the district court properly invoked sec. 1252(g) to reject Boguslaw's claim.

In the alternative, the INS asserts that the district court could and should have rejected his habeas corpus petition for failure to exhaust his administrative remedies. It points out that if Boguslaw is challenging the 1996 denial of adjustment of status, then he could have raised this issue again in his removal proceedings before the Immigration Judge, who is authorized by regulation to grant an adjustment of status for those entitled to one. See 8 C.F.R. sec. 240.1(a)(ii). Boguslaw did appear before the Immigration Judge, but he acceded to the INS's allegations in exchange for voluntary departure. Moreover, he did not appeal his decision to the BIA. We agree with the agency that this amounted to a failure to exhaust administrative remedies. This in turn means that the district court correctly refused to consider the particular arguments about the visa application process that he was urging. Fedorca, 197 F.3d at 240; Kashani, 793 F.2d at 824.

Boguslaw naturally would like to avoid further proceedings, and he thus urges us to waive the exhaustion requirement on grounds of futility and reach the merits. In the end, he plausibly asserts, the door to the courthouse would be shut tight, because 8 U.S.C. sec. 1252(a)(2)(B)(i) precludes judicial review of a denial of an adjustment of status. That may be true, but the implication of the argument is that Congress must always provide for some judicial review, and such a proposition is plainly wrong. Carlson v. Landon, 342 U.S. 524, 537 (1952). If sec. 1252(a)(2)(B)(i) applies to Boguslaw's case, there is

nothing that this court is empowered to do for him. Furthermore, this may be the type of case in which one would expect to see such a regime. By its very label, sec. 1252(a)(2)(B) applies to "denials of discretionary relief" (emphasis added). On the other hand, Boguslaw's case may fall outside its scope because he is challenging a pure error of law (the interpretation of sec. 637 of the IIRIRA), not an exercise of discretion). Compare Czerkies v. U.S. Department of Labor, 73 F.3d 1435, 1439 (7th Cir. 1996) (en banc) (narrowly interpreting foreclosure statute). It may also be significant that sec. 637 was added to the IIRIRA in response to State Department and INS administrative problems during the 1995 Diversity Lottery. We are skeptical that Congress, in attempting to "pursu[e] justice for the thousands of Poles who were the victims of this bureaucratic bungle," 142 Cong. Rec. E404-01 (March 19, 1996) (statement of Rep. Kleczka), meant to leave all oversight of this provision in the hands of the very same bungling bureaucrats. In the end, however, we leave these difficult questions for another day, because we conclude they do not prohibit the limited procedural review we exercise here.

C.

That review, as we indicated earlier, is limited to a determination of what action exactly the INS has taken here. Nothing in 8 U.S.C. sec. 1252(g) precludes this. Looking narrowly at the August 16 order, one could say that we are addressing a "decision or action" to "execute [a] removal order[ ]." But that takes too restricted a view of the issue here. AADC acknowledges that we may interpret the action in question (here, the August 16 order) to see whether there is any decision made "by the Attorney General" within the meaning of sec. 1252(g). At this point, the answer for Boguslaw is that there is no such decision as a practical matter (unless the decision is the deferral decision under which he is entitled to stay). A decision "by the Attorney General" must be a decision of the agency. It does not extend to decisions by INS support staff to ignore decisions of the agency. If Boguslaw were attacking a discretionary decision by the INS to remove him, then we would not have jurisdiction to block his removal. See, e.g., Fedorca, 197 F.3d at 240; Botezatu, 195 F.3d at 313. But that is not the situation here--in fact, this case presents precisely the opposite problem. In its notice, the INS has indicated that it is not going to remove Boguslaw from the United States. That is its decision, and nothing in sec. 1252(g) or anywhere else precludes us from holding subsidiary officials in the agency to it.

III

We Reverse the judgment of the district court and Remand this case with instructions to the Chicago office of the INS to respect the deferral decision currently in effect, unless and until, through authorized procedures, the agency as a whole comes to a final decision on Boguslaw Fornalik's status.